# ILLINOIS STATE BOARD OF ELECTIONS *v.* SOCIALIST WORKERS PARTY ET AL.

No. 77–1248.   Argued November 6, 1978—Decided February 22, 1979

174

Marshall, J., delivered the opinion of the Court, in which Brennan, Stewart, White, Blackmun, and Powell, JJ., joined, and in Parts I, II, and IV of which Stevens, J., joined. Blackmun, J., filed a concurring opinion, *post*, p. 188. Stevens, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 189. Burger, C. J., concurred in the judgment. Rehnquist, J., filed an opinion concurring in the judgment, *post*, p. 190.

*Michael L. Levinson* argued the cause for appellant. With him on the briefs were *Michael E. Lavelle* and *Franklin J. Lunding, Jr.*

*Jeffrey D. Colman* argued the cause for appellees Rose et al. With him on the brief was *William H. Luking.* *Ronald Reosti* argued the cause for appellees Socialist Workers Party et al. With him on the brief was *Lance Haddix.* *Thomas A. Foran* filed a brief for appellee Chicago Board of Election Commissioners.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Under the Illinois Election Code, new political parties and independent candidates must obtain the signatures of 25,000 qualified voters in order to appear on the ballot in statewide elections.[1] However, a different standard applies in elections

---

[1] Under Ill. Ann. Stat., ch. 46, § 10-2 (Supp. 1978):

"A political party which, at the last general election for State and county officers, polled for its candidate for Governor more than 5% of the entire vote cast for Governor, is hereby declared to be an 'established political party' as to the State and as to any district or political subdivision thereof.

"A political party which, at the last election in any congressional district, legislative district, county, township, school district, park district, municipality or other district or political subdivision of the State, polled more than 5% of the entire vote cast within such congressional district, legislative district, county, township, school district, park district, municipality, or political subdivision of the State, where such district, political subdivision or municipality, as the case may be, has voted as a unit for the election of officers to serve the respective territorial area of such district, political subdivision or municipality, is hereby declared to be an 'established political party' within the meaning of this Article as to such district, political subdivision or municipality."

A *new* political party is one that has not met these requirements.

Individuals desiring to form a new political party throughout the State must file with the State Board of Elections a petition that, *inter alia,* is "signed by not less than 25,000 qualified voters." In *Communist Party of Illinois* v. *State Board of Elections,* 518 F. 2d 517 (CA7), cert. denied,

for offices of political subdivisions of the State. The minimum number of signatures required for those elections is 5% of the number of persons who voted at the previous election for offices of the particular subdivision.[2] In the city of Chicago, application of this standard has produced the in-

423 U. S. 986 (1975), the Court of Appeals held unconstitutional the proviso in this section requiring "that no more than 13,000 signatures from the same county may be counted toward the required total of 25,000 signatures." Ill. Ann. Stat., ch. 46, § 10–2 (Supp. 1978).

A party that files a completed petition becomes entitled to place "upon the ballot at such next ensuing election such list of . . . candidates for offices to be voted for throughout the State . . . under the name of and as the candidates of such new political party." Ibid.

With respect to independent candidates, § 10–3 (Supp. 1978) provides in pertinent part:

"Nomination of independent candidates (not candidates of any political party), for any office to be filled by the voters of the State at large may also be made by nomination papers signed in the aggregate for each candidate by not less than 25,000 qualified voters of the State; Provided, however, that no more than 13,000 signatures from the same county may be counted toward the required total of 25,000 signatures."

The record does not reveal whether the State enforces the proviso.

[2] Section 10–2 provides:

"If such new political party shall be formed for any district or political subdivision less than the entire State, such petition shall be signed by qualified voters equaling in number not less than 5% of the number of voters who voted at the next preceding general election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area."

Under § 10–3:

"Nominations of independent candidates for public office within any district or political subdivision less than the State, may be made by nomination papers signed in the aggregate for each candidate by qualified voters of such district, or political division, equaling not less than 5%, nor more than 8% (or 50 more than the minimum, whichever is greater) of the number of persons, who voted at the next preceding general election in such district or political sub-division in which such district or political sub-division voted as a unit for the election of officers to serve its respective territorial area."

congruous result that a new party or an independent candidate needs substantially more signatures to gain access to the ballot than a similarly situated party or candidate for state-wide office.[3] The question before us is whether this discrepancy violates the Equal Protection Clause of the Fourteenth Amendment.

## I

In January 1977, the Chicago City Council ordered a special mayoral election to be held on June 7, 1977, to fill the vacancy created by the death of Mayor Richard J. Daley. Pursuant to that order, the Chicago Board of Election Commissioners (Chicago Board) issued an election calendar that listed the filing dates and signature requirements applicable to independent candidates and new political parties. Independent candidates had to obtain 35,947 valid signatures by February 19, and new political parties were required to file petitions with 63,373 valid signatures by April 4.[4] Subsequently, the Chicago Board and the State Board of Elections (State Board) agreed for purposes of the special election to bring into conformity the requirements for independent candidates

---

[3] Candidates and new parties in Cook County, Ill., which is more populous than Chicago, would also have to obtain more than 25,000 signatures. In all political subdivisions of the State other than Chicago and Cook County, the 5% standard requires fewer than 25,000 signatures. Tr. of Oral Arg. 20.

[4] This disparity in the signature requirements arose because the State and Chicago Boards used voting figures from the April 1, 1975, elections in computing the requirements for independents, but used figures from the November 2, 1976, general election in their calculations for new parties. The pertinent statutory language regarding signature requirements for independent candidates, however, is identical to that for new parties. Compare Ill. Ann. Stat., ch. 46, § 10–3 (Supp. 1978), with § 10–2.

Section 10–6 of the Election Code provides that nominating petitions for independents and new parties must be filed at least 64 days prior to the election, here, by April 4. The record does not reflect what caused the discrepancy in filing dates in this case.

and new parties. The filing deadline for independents was extended to April 4, and the signature requirement for new parties was reduced to 35,947.

Because they had received less than 5% of the votes cast in the last mayoral election, the Socialist Workers Party and United States Labor Party were new political parties as defined in the Illinois statute. See n. 1, *supra*. Along with Gerald Rose, a candidate unaffiliated with any party, they were therefore subject to the signature requirements and filing deadlines specified in the election calendar. On January 24, 1977, the Socialist Workers Party and two voters who supported its candidate for Mayor brought this action against the Chicago Board and the State Board to enjoin enforcement of the signature requirements and filing deadlines for new parties.[5] One week later, Gerald Rose, the United States Labor Party, and four voters sued the Chicago Board, challenging the restrictions on new parties and independent candidates. The State Board intervened as a defendant pursuant to 28 U. S. C. § 2403, and the District Court consolidated the two cases for trial.

Plaintiff-appellees contended at trial that the discrepancy between the requirements for state and city elections violated the Equal Protection Clause. They argued further that the restrictions on independent candidates and new parties were unconstitutionally burdensome in the context of a special election because of the short time for collection of signatures between notice of the election and the filing deadline. The

---

[5] The Chicago Board is responsible for accepting nominating petitions for candidates and preparing the ballots for special elections. Ill. Ann. Stat., ch. 46, §§ 7–60, 7–62, 10–6 (Supp. 1978). It also has "charge of and make[s] provisions for all elections, general, special, local, municipal, state and county, and all others of every description to be held in such city or any part thereof, at any time." § 6–26 (Supp. 1978). The State Board exercises "general supervision over the administration of the registration and election laws throughout the State." § 1A–1 (Supp. 1978); Ill. Const., Art. 3, § 5.

Chicago Board's primary response was that the decision in *Jackson* v. *Ogilvie,* 325 F. Supp. 864 (ND Ill.), summarily aff'd, 403 U. S. 925 (1971), upholding Illinois' 5% signature requirement, foreclosed the constitutional challenge in this case.[6]

In an opinion issued on March 14, 1977, the District Court determined that *Jackson* addressed neither the circumstances of a special election nor the disparity between state and city signature requirements at issue here. *Socialist Workers Party* v. *Chicago Bd. of Election Comm'rs,* 433 F. Supp. 11, 16–17, 19. On the merits of appellees' equal protection challenge, the court found

> "[no] rational reason why a petition with identical signatures can satisfy the legitimate state interests for restricting ballot access in state elections, and yet fail to do the same in a lesser unit. *Lendall* v. *Jernigan,* 424 F. Supp. 951 (ED Ark. 1977). Any greater requirement than 25,000 signatures cannot be said to be the least drastic means of accomplishing the state's goals, and must be found to unduly impinge [on] the constitutional rights of independents, new political parties, and their adherents." *Id.,* at 20 (footnote omitted).

Accordingly, the District Court permanently enjoined the enforcement of the 5% provision insofar as it mandated more than 25,000 signatures, the number required for statewide elections. The court also declined to dismiss appellees' claim

---

[6] Although the State Board was afforded notice and an opportunity to participate in the District Court proceedings, only the Chicago Board appeared for argument on plaintiff-appellees' motion for a permanent injunction. After the court entered the injunction, the State Board moved to vacate the decision, advancing many of the grounds previously asserted by the Chicago Board.

Only the State Board has appealed to this Court. The Chicago Board, defending its settlement agreement, see *infra,* at 180, appears as an appellee. Subsequent references to the "appellees" in this opinion, however, will include only the plaintiff-appellees.

that the April 4 filing deadline coupled with the signature requirement impermissibly burdened First and Fourteenth Amendment rights, but it postponed a decision on this issue pending submission of additional evidence to justify the selection of that date.

On March 17, 1977, the Chicago Board and the appellees concluded a settlement agreement with respect to the unresolved issues. The agreement was incorporated into an order entered the same day which provided that "solely as applied to the Special Mayoral Election to be held in Chicago on June 7, 1977," the signature requirement would be reduced to 20,000 and the filing deadline extended to April 18. App. 74. The District Court denied the State Board's subsequent motion to vacate both orders.

The State Board, but not the Chicago Board, appealed from both the March 14 order and the March 17 order. In a *per curiam* decision rendered six months after the election, the Court of Appeals for the Seventh Circuit adopted the opinion of the District Court. 566 F. 2d 586, 587 (1977). Also, with respect to the March 17 order, the Court of Appeals dismissed as moot the State Board's contention that the Chicago Board lacked authority to conclude a settlement agreement without prior state approval. In so ruling, the court noted that the settlement order applied only to the June 7 election, which had long passed, and held that the question of the Chicago Board's authority for its actions was not "capable of repetition, yet evading review," *id.*, at 588, quoting *DeFunis* v. *Odegaard*, 416 U. S. 312, 318–319 (1974).

We noted probable jurisdiction, 435 U. S. 994 (1978), and we now affirm.

II

Appellant argues here, as it did below, that this Court's summary affirmance of *Jackson* v. *Ogilvie, supra*, is dispositive of the equal protection challenge here. In analyzing this contention, we note at the outset that summary affirmances have considerably less precedential value than an opinion on

the merits. See *Edelman* v. *Jordan*, 415 U. S. 651, 671 (1974). As Mr. Chief Justice Burger observed in *Fusari* v. *Steinberg*, 419 U. S. 379, 392 (1975) (concurring opinion), "upon fuller consideration of an issue under plenary review, the Court has not hesitated to discard a rule which a line of summary affirmances may appear to have established." See *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 14 (1976).

Moreover, we agree with the District Court's conclusion that *Jackson* does not govern the issues currently before us. In that case, the Reverend Jesse Jackson, an independent candidate for Mayor of Chicago, attacked the 5% signature requirement for independent candidates as an impermissible burden on the exercise of First Amendment rights. He contended as well that the discrepancy between the 5% rule and the less stringent requirements for candidates of established political parties violated the Equal Protection Clause. A three-judge District Court rejected both claims, finding the 5% requirement reasonable and the burdens imposed on independent and established party candidates roughly equivalent. Appellees mount a different challenge. They do not attack the lines drawn between independent and established party candidates. Rather, their equal protection claim rests on the discrimination between those independent candidates and new parties seeking access to the ballot in statewide elections and those similarly situated candidates and parties seeking access in city elections.

Appellant urges, however, that even though the District Court in *Jackson* did not explicitly mention the equal protection issue presented here, the issue was raised in a memorandum supporting Jackson filed with the District Court by the State. In the course of arguing that the election law discriminated against independent candidates, the memorandum stated:

"It must also be remembered that it is even more difficult for an independent candidate to obtain signatures than

it would be for an independent party. Yet a whole new State political party needs only 25,000 signatures throughout the entire State for state officers, (Section 10–2), while a single independent candidate for only the office of Mayor of Chicago, needs almost 60,000 signatures. This also is an invidious discrimination against one seeking the office of Mayor of Chicago." Memorandum of Law, App. to Juris. Statement in *Jackson* v. *Ogilvie*, O. T. 1970, No. 70–1341, p. B–23.[7]

In view of the District Court's ultimate decision, appellant contends, this issue was necessarily resolved against Jackson, and therefore was resolved by this Court as well in its summary affirmance.

The District Court in *Jackson,* however, framed the equal protection issue before it as "whether [the 5% signature] requirement operates to discriminate against the plaintiff by depriving him of a right granted to candidates of established political parties." 325 F. Supp., at 868. The jurisdictional statement posed the question in similar terms. Juris. Statement in *Jackson* v. *Ogilvie*, O. T. 1970, No. 70–1341, pp. 14–15. Although the jurisdictional statement alluded to the State's memorandum, *id.,* at 15, and incorporated it as a separate appendix, *id.,* at B–21—B–24, at no point did it directly address the question now before us.

This omission disposes of appellant's argument. As we stated in *Mandel* v. *Bradley,* 432 U. S. 173, 176 (1977), the precedential effect of a summary affirmance can extend no farther than "the precise issues presented and necessarily decided by those actions." A summary disposition affirms

---

[7] Appellees Rose and the United States Labor Party argue that even this statement does not present the issue now before the Court. In their view, it refers to the purported disparity between the treatment of independent candidates and that of new political parties. In fact, appellees argue, there is and was no such disparity. Compare Ill. Ann. Stat., ch. 46, § 10–2 (Supp. 1978), with § 10–3.

only the judgment of the court below, *ibid.*, quoting *Fusari* v. *Steinberg, supra,* at 391–392 (BURGER, C. J., concurring), and no more may be read into our action than was essential to sustain that judgment. See *Usery* v. *Turner Elkhorn Mining Co., supra,* at 14; *McCarthy* v. *Philadelphia Civil Service Comm'n,* 424 U. S. 645, 646 (1976) (*per curiam*). Questions which "merely lurk in the record," *Webster* v. *Fall,* 266 U. S. 507, 511 (1925), are not resolved, and no resolution of them may be inferred. Assuming that the State's memorandum in *Jackson* can be read as advancing the issue presented here, see n. 7, *supra,* the issue was by no means adequately presented to and necessarily decided by this Court. *Jackson* therefore has no effect on the constitutional claim advanced by appellees.

## III

In determining whether the Illinois signature requirements for new parties and independent candidates as applied in the city of Chicago violate the Equal Protection Clause, we must examine the character of the classification in question, the importance of the individual interests at stake, and the state interests asserted in support of the classification. See *Memorial Hospital* v. *Maricopa County,* 415 U. S. 250, 253–254 (1974); *Dunn* v. *Blumstein,* 405 U. S. 330, 335 (1972); *Kramer* v. *Union School Dist.,* 395 U. S. 621, 626 (1969); *Williams* v. *Rhodes,* 393 U. S. 23, 30 (1968).

The provisions of the Illinois Election Code at issue incorporate a geographic classification. For purposes of setting the minimum-signature requirements, the Code distinguishes state candidates, political parties, and the voters supporting each, from city candidates, parties, and voters. In 1977, an independent candidate or a new political party in Chicago, a city with approximately 718,937 voters eligible to sign nominating petitions for the mayoral election in 1977,[8] had to

---

[8] Chicago Board of Election Commissioners, Municipal Election Results (Apr. 1, 1975).

secure over 10,000 more signatures on nominating petitions than an independent candidate or new party in state elections, who had a pool of approximately 4.5 million eligible voters from which to obtain signatures.[9] That the distinction between state and city elections undoubtedly is valid for some purposes does not resolve whether it is valid as applied here.

Restrictions on access to the ballot burden two distinct and fundamental rights, "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams* v. *Rhodes, supra,* at 30. The freedom to associate as a political party, a right we have recognized as fundamental, see 393 U. S., at 30–31, has diminished practical value if the party can be kept off the ballot. Access restrictions also implicate the right to vote because, absent recourse to referendums, "voters can assert their preferences only through candidates or parties or both." *Lubin* v. *Panish,* 415 U. S. 709, 716 (1974). By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences. And for reasons too self-evident to warrant amplification here, we have often reiterated that voting is of the most fundamental significance under our constitutional structure. *Wesberry* v. *Sanders,* 376 U. S. 1, 17 (1964); *Reynolds* v. *Sims,* 377 U. S. 533, 555 (1964); *Dunn* v. *Blumstein, supra,* at 336.

When such vital individual rights are at stake, a State must establish that its classification is necessary to serve a compelling interest. *American Party of Texas* v. *White,* 415 U. S. 767, 780–781 (1974); *Storer* v. *Brown,* 415 U. S. 724, 736 (1974); *Williams* v. *Rhodes, supra,* at 31. To be sure, the Court has previously acknowledged that States have a

---

[9] U. S. Dept. of Commerce, Bureau of the Census, Statistical Abstract of the United States 505 (1977).

legitimate interest in regulating the number of candidates on the ballot. In *Lubin* v. *Panish, supra,* at 715, we observed:

"A procedure inviting or permitting every citizen to present himself to the voters on the ballot without some means of measuring the seriousness of the candidate's desire and motivation would make rational voter choices more difficult because of the size of the ballot and hence would tend to impede the electoral process. . . . The means of testing the seriousness of a given candidacy may be open to debate; the fundamental importance of ballots of reasonable size limited to serious candidates with some prospects of public support is not."

Similarly, in *Bullock* v. *Carter,* 405 U. S. 134, 145 (1972) (footnote omitted), the Court expressed concern for the States' need to assure that the winner of an election "is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections." Consequently, we have upheld properly drawn statutes that require a preliminary showing of a "significant modicum of support" before a candidate or party may appear on the ballot. *Jenness* v. *Fortson,* 403 U. S. 431, 442 (1971); see, *e. g., American Party of Texas* v. *White, supra.*

However, our previous opinions have also emphasized that "even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty," *Kusper* v. *Pontikes,* 414 U. S. 51, 58–59 (1973), and we have required that States adopt the least drastic means to achieve their ends. *Lubin* v. *Panish, supra,* at 716; *Williams* v. *Rhodes, supra,* at 31–33. This requirement is particularly important where restrictions on access to the ballot are involved. The States' interest in screening out frivolous candidates must be considered in light of the significant role that third parties have played in the political development of the Nation. Abolitionists, Progressives, and Populists have undeniably had influence, if not always elec-

toral success. As the records of such parties demonstrate, an election campaign is a means of disseminating ideas as well as attaining political office. See A. Bickel, Reform and Continuity 79–80 (1971); W. Binkley, American Political Parties 181–205 (3d ed. 1959); H. Penniman, Sait's American Political Parties and Elections 223–239 (5th ed. 1952). Overbroad restrictions on ballot access jeopardize this form of political expression.

The signature requirements for independent candidates and new political parties seeking offices in Chicago are plainly not the least restrictive means of protecting the State's objectives. The Illinois Legislature has determined that its interest in avoiding overloaded ballots in statewide elections is served by the 25,000-signature requirement. Yet appellant has advanced no reason, much less a compelling one, why the State needs a more stringent requirement for Chicago. At oral argument, appellant explained that the signature provisions for statewide elections originally reflected a different approach than those for elections in political subdivisions. Tr. of Oral Arg. 35–37. Not only were independent candidates and new political parties in state elections required to obtain 25,000 signatures, but those signatures also had to meet standards pertaining to geographic distribution. By comparison, candidates and parties in city elections had only to obtain signatures from a flat percentage of the qualified voters. In *Moore* v. *Ogilvie,* 394 U. S. 814 (1969), this Court struck down on equal protection grounds Illinois' requirement that the nominating petition of a candidate for statewide office include the signatures of at least 200 qualified voters from at least 50 counties. Following *Moore,* the Court of Appeals for the Seventh Circuit invalidated a provision in the amended statute which specified that no more than 13,000 signatures on a new party's petition for statewide elections could come from any one county. *Communist Party of Illinois* v. *State Board of Elections,* 518 F. 2d 517, cert. denied,

423 U. S. 986 (1975). Thus, appellant noted, the invalidation of the geographic constraints has tied the requirements for both city and state candidates solely to a population standard, giving rise to the anomaly at issue here.

Although this account may explain the anomaly, appellant still has suggested no reasons that justify its continuation. Historical accident, without more, cannot constitute a compelling state interest. We therefore hold that the Illinois Election Code is unconstitutional insofar as it requires independent candidates and new political parties to obtain more than 25,000 signatures in Chicago.

## IV

Appellant finally challenges the Court of Appeals' disposition of its appeal from the March 17 settlement order. The court dismissed as moot appellant's claim that the Chicago Board lacked authority to conclude a settlement agreement without the State's consent. In appellant's view, the court erred in not placing this claim within the exception to the mootness doctrine for cases that are "capable of repetition, yet evading review." Southern Pacific Terminal Co. v. ICC, 219 U. S. 498, 515 (1911).

In Weinstein v. Bradford, 423 U. S. 147, 149 (1975), we elaborated on this exception, holding that a case is not moot when:

"(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again."

Although the first branch of the test is satisfied here, appellant has presented no evidence creating a reasonable expectation that the Chicago Board will repeat its purportedly unauthorized actions in subsequent elections. Appellant's conclusory assertions that the actions are capable of repetition

are not sufficient to satisfy the *Weinstein* test, particularly since appellant does not contend that the Chicago Board has ever attempted previously to conclude litigation without its approval. The Chicago Board's entry into a settlement agreement reflected neither a policy it had determined to continue, cf. *United States* v. *New York Telephone Co.*, 434 U. S. 159, 165 n. 6 (1977), nor even a consistent pattern of behavior, cf. *SEC* v. *Sloan*, 436 U. S. 103, 109–110 (1978). And the Chicago Board's action patently was not a matter of statutory prescription, as was the case in other election decisions on which appellant relies, *e. g., Storer* v. *Brown*, 415 U. S., at 737 n. 8; *Moore* v. *Ogilvie, supra,* at 816. We therefore find that appellant's challenge was properly dismissed as moot.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

The Chief Justice concurs in the judgment.

Mr. Justice Blackmun, concurring.

Although I join the Court's opinion and its strict-scrutiny approach for election cases, I add these comments to record purposefully, and perhaps somewhat belatedly, my unrelieved discomfort with what seems to be a continuing tendency in this Court to use as tests such easy phrases as "compelling [state] interest" and "least drastic [or restrictive] means." See, *ante,* at 184, 185, and 186. I have never been able fully to appreciate just what a "compelling state interest" is. If it means "convincingly controlling," or "incapable of being overcome" upon any balancing process, then, of course, the test merely announces an inevitable result, and the test is no test at all. And, for me, "least drastic means" is a slippery slope and also the signal of the result the Court has chosen to reach. A judge would be unimaginative indeed if he could not come up with something a little less "drastic" or a little less "restrictive" in almost any situation, and thereby enable himself to

vote to strike legislation down. This is reminiscent of the Court's indulgence, a few decades ago, in substantive due process in the economic area as a means of nullification.

I feel, therefore, and have always felt, that these phrases are really not very helpful for constitutional analysis. They are too convenient and result oriented, and I must endeavor to disassociate myself from them. Apart from their use, however, the result the Court reaches here is the correct one. It is with these reservations that I join the Court's opinion.

Mr. Justice Stevens, concurring in part and concurring in the judgment.

Placing additional names on a ballot adds to the cost of conducting elections and tends to confuse voters. The State therefore has a valid interest in limiting access to the ballot to serious candidates. If that interest is adequately served by a 25,000-signature requirement in a statewide election, the same interest cannot justify a larger requirement in a smaller election.

Nonetheless, I am not sure that the disparity evidences a violation of the Equal Protection Clause. The constitutional requirement that Illinois govern impartially would be implicated by a rule that discriminates, for example, between Socialists and Republicans or between Catholics and Protestants. But I question whether it has any application to rules prescribing different qualifications for different political offices. Rather than deciding that question, I would simply hold that legislation imposing a significant interference with access to the ballot must rest on a rational predicate. This legislative remnant is without any such support. It is either a product of a malfunction of the legislative process or merely a by-product of this Court's decision in *Moore* v. *Ogilvie*, 394 U. S. 814, see *post*, at 190–191 (Rehnquist, J., concurring in judgment). In either event, I believe it has deprived appellees of their liberty without the "due process of lawmaking" that the

Fourteenth Amendment requires. Cf. *Delaware Tribal Business Committee* v. *Weeks,* 430 U. S. 73, 98 (STEVENS, J., dissenting).

For these reasons I concur in the Court's judgment and in Parts I, II, and IV of its opinion.

MR. JUSTICE REHNQUIST, concurring in the judgment.

I concur in the judgment of the Court, but I cannot join its opinion: It employs an elaborate analysis where a very simple one would suffice. The disparity between the state and city signature requirements does not make sense, and this Court is intimately familiar with the reasons why.

In 1968, Illinois had a coherent set of petition requirements for obtaining a place on the ballot. In order to appear on the ballot in a county or city election, it was necessary for independent candidates and new political parties to obtain voter signatures equal in number to 5% of the voters who voted in the political subdivision at the last general election. Requirements for statewide office put greater emphasis on geographical balance: Independent candidates and new political parties needed 25,000 signatures, and at least 200 signatures had to be obtained from each of 50 counties within the State. Thus, a candidate for statewide office at that time could get on the ballot with fewer signatures than a candidate for office in Cook County, but he was also subject to special restrictions. It was reasonable for Illinois to conclude that this scheme best vindicated its interest in "protect[ing] the integrity of its political processes from frivolous or fraudulent candidacies." *Bullock* v. *Carter,* 405 U. S. 134, 145 (1972). Cook County is not Illinois, and all the State asked was that candidates and political parties interested in statewide office produce this minimal evidence of statewide support.

In 1969, this Court held that the 200 voters per county requirement violated the Equal Protection Clause because dif-

ferent counties had different populations. *Moore* v. *Ogilvie*, 394 U. S. 814 (1969). That decision led to a holding by the Seventh Circuit that the statute, as amended by the legislature after *Moore* to place a 13,000-signature limit on new political party signatures from any one county, was likewise a denial of equal protection. *Communist Party of Illinois* v. *State Board of Elections*, 518 F. 2d 517 (CA7), cert. denied, 423 U. S. 986 (1975).

The courts having knocked out key panels in an otherwise symmetrical mosaic, it is not surprising that little sense can be made of what is left. Given this history, I cannot subscribe to my Brother STEVENS' alternative characterization of Illinois' problem as "a malfunction of the legislative process." The legislature enacted a comprehensive Election Code, and amended it once in response to a decision of this Court. The attorneys for the State Board of Elections are now placed in the position of having to defend a law which is but a truncated version of the original enactment.

All of this explains the disparate treatment of statewide and Chicago candidates; it does not justify it under any rational-basis test, and appellant has scarcely made any effort to do so before this Court. In the light of this history, and without engaging in any elaborate analysis which pretends that we are dealing with the considered product of a legislature, I would hold that the disparate treatment bears no rational relationship to any state interest.