**Nick BELLUSO, Francis J. Richards, Jr., and William A. Forsyth, Sr.**

**v.**

**David POYTHRESS, Thomas B. Murphy, John R. Riley, Paul D. Coverdell, Herbert Jones, Jr., Marge Thurman, and Matthew H. Patton.**

Civ. A. No. 80–283 A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Feb. 25, 1980.

Lloyd E. N. Hall, Hall, White & Daum, Atlanta, Ga., for plaintiffs.

Micheal J. Bowers, Senior Asst. Atty. Gen., Atlanta, Ga., for defendants.

## ORDER

RICHARD C. FREEMAN, District Judge.

Plaintiffs came before this court on February 20, 1980 seeking a declaratory judgment, damages, and preliminary and permanent injunctive relief. Plaintiffs allege that their rights under the first and fourteenth amendments to the United States Constitution have been violated by the failure of the defendant members of the Georgia Presidential Preference Primary Selection Committee to include the name of plaintiff Nick Belluso on the Republican ballot for the March 11, 1980 Georgia Presidential Preference Primary. 42 U.S.C. § 1983, 28 U.S.C. § 1343.

On February 22, this court held an evidentiary hearing on plaintiffs' claims. At that time, the court understood the purpose of the hearing to be to determine the propriety of preliminary injunctive relief, the function of a preliminary injunction being "merely to preserve the status quo until the merits of a case can be adjudicated." *Morgan v. Fletcher*, 518 F.2d 236, 239 (5th Cir. 1975). The court failed to make clear, however, the nature of the proceedings, or formally to propose consolidation of the preliminary injunction hearing with a trial on the merits, Rule 65(a)(2), Fed.R.Civ.P. Nevertheless, after hearing the evidence, we believe our ruling today will be dispositive of plaintiffs' claims. In the interest of justice, therefore, we ask that the parties inform the court within two days of receipt of this order if they wish to offer further evidence or argument.

## STATEMENT OF THE FACTS

Plaintiff Nick Belluso is a recent convert to the Georgia Republican Party, but a perennial, though unsuccessful, candidate for both state and national public office. Mr. Belluso has run, *inter alia*, for Alderman of the City of Atlanta, State Senator, United States Representative, and Governor of the State of Georgia. In the past, Mr. Belluso campaigned as either an independent or Democratic candidate. Plaintiffs Francis J. Richards, Jr. and William A. Forsyth, Sr. are registered voters residing in DeKalb County, Georgia, who wish to vote for Mr. Belluso in the Georgia Presidential Preference Primary as the Republican Party's candidate for President of the United States. Defendants Poythress, Murphy, Riley, Coverdell, Jones, Thurman, and Patton comprise the Georgia Presidential Preference Primary Selection Committee (Selection Committee) and are charged under state law with the responsibility of choosing the names of the candidates that will ap-

pear on the parties' primary ballots. *See* Ga.Code § 34–1003a.

The state of Georgia provides by law that a presidential preference primary shall be held every four years, and sets out the procedures to be followed by the participating political parties. Section 34–1003a governs the selection of candidates to appear on the party ballots, and provides, in pertinent part:

The name of any candidate for a political party or body nomination for the office of President of the United States shall be printed upon the ballot used in such primary:

(a) Upon the direction of a presidential candidate selection committee composed of a nonvoting chairman who shall be the Secretary of State, the Speaker of the House of Representatives, the Majority Leader of the Senate, the Minority Leaders of both the House and Senate, and the chairmen of the political parties and bodies who conduct a presidential preference primary pursuant to section 34–1002. The Secretary of State, during the second week in January of the year in which a presidential preference primary is held, shall prepare and publish a list of names of potential presidential candidates who are generally advocated or recognized in news media throughout the United States as aspirants for that office and who are members of a political party or body which will conduct a presidential preference primary in this State. The Secretary of State shall submit such list of names of potential presidential candidates to the selection committee during the third week in January of the year a presidential preference primary is held. . . . Each person designated by the Secretary of State as a presidential candidate shall appear upon the ballot of the appropriate political party or body unless all committee members of the same political party as the candidate agree to delete such candidate's name from the ballot.

. . .

(b) Any presidential candidate whose name is not selected by the Secretary of State or whose name is deleted by the selection committee may request, in writing, to the chairman of the selection committee, prior to February 10 of each year a presidential preference primary is held, that his name be placed on the ballot. Not earlier than February 10, nor later than February 15, the Secretary of State shall convene the committee to consider such requests. If any member of the selection committee of the same political party or body as the candidate requests that such candidate's name be placed on the ballot, the committee shall direct the Secretary of State to place the candidate's name on the ballot. Within five days after such meeting, the Secretary of State shall notify the potential presidential candidate whether or not his name will appear on the ballot.

The results of the preference primary are binding on each party's delegates to the national nominating conventions only insofar as the party may determine by party rule. Ga.Code § 34–1002a. The political parties may apportion their delegates as they choose. 1979 Georgia Laws, pp. 1316, 1317.

On January 2, 1980, plaintiff Belluso sent a letter to Secretary of State David Poythress requesting that his name be included on the Republican ballot. The letter was supplemented by copies of Belluso's filings with the Federal Election Committee, a copy of the check for $1500 that he had sent as a filing fee to be included on the Republican ballot in the South Carolina presidential primary, copies of eleven stories about Belluso's candidacy appearing in major newspapers, and lists of broadcasted radio and television interviews. Defendants' Exhibit # 1.

Pursuant to Ga.Code § 34–1003a, in the third week of January, Secretary of State Poythress submitted a list of potential Republican presidential candidates to the Selection Committee. The list included John Anderson, Howard Baker, George Bush, John Connally, Philip Crane, Robert Dole, and Ronald Reagan. Mr. Belluso's name was absent. As permitted by Ga.Code

§ 34–1003a(b), plaintiff then wrote to Matthew W. Patton, chairman of the State Republican Party and a member of the Selection Committee, requesting that his name be added to the list. Although all committee members of the same party must agree to delete a name, the request of only one member is required to add a name. Belluso's request for inclusion was denied. Mr. Belluso never contacted any other committee members about his desired candidacy. No names on the list of candidates submitted by the Secretary were ultimately deleted by the Selection Committee, but three names were added. The Democratic committee members added Richard B. Kay to the Democratic ballot, and Harold Stassen and Benjamin Fernandez were added to the Republican ballot.

At the February 22 hearing, the court heard testimony that the original list of candidates is compiled by the Secretary and his staff without the advice or consultation of the Selection Committee. The statute requires that the Secretary submit the names of presidential candidates "who are generally advocated or recognized in news media throughout the United States as aspirants for that office . . . ." Ga.Code § 34–1003a. In applying this admittedly broad statutory standard to lesser-known candidates, the Secretary testified he considered recommendations of his staff, materials submitted by the candidates, and impressions formed by personal experience. Although the national scope of the news coverage of the candidate was a factor, there was no weighting of the number or length of articles published about each candidate. The Secretary maintained no clipping service, and used no specific method to analyze the celebrity of presidential hopefuls. He did not evaluate the candidates' financial assets or ability to raise money, the candidates' chances of winning, the electorate's view of the candidates, or the seriousness of the candidates' platforms. The Secretary testified he considered manifestations in the media coverage of a candidate's own serious intent to pursue the presidency and serve in that office if elected.

Applying this test of seriousness to the materials submitted by plaintiff Belluso, the Secretary rejected the plaintiff's application. Secretary Poythress testified that the news articles the plaintiff chose to offer in support of his candidacy revealed a frivolous desire for office and an insincere intent to serve if elected. The Secretary's evaluations were based on the news coverage of Mr. Belluso as a "kookie" candidate. Much of the press's treatment of Mr. Belluso, which included articles in such major newspapers as the *Washington Post*, the *Detroit Free Press, The Houston Post*, and *The Atlanta Constitution*, focused on the plaintiff's organization of a Presidential Kookie Candidate Convention in December 1979, and plaintiff's labelling of himself as a "kookie" candidate. Among the proposals cited by the Secretary as evidence of plaintiff's insincerity was Mr. Belluso's promise that, if elected, he would sit in a rocking chair on the porch of the White House and do nothing but rock during his term of office. As manifestation of the frivolous nature of plaintiff's candidacy, the Secretary pointed to Mr. Belluso's reported hiring of "Keystone Cops" armed with water pistols and laughing gas as his substitute for Secret Service protection.

Some of the Republican members of the Selection Committee also testified. Georgia State Senator Paul Coverdell stated that "general recognition" and "seriousness" was the standard the Selection Committee applied in drawing up the final list of candidates, and that he had never heard of Nick Belluso or his candidacy until the commencement of this lawsuit. Mr. Coverdell is co-chairman of George Bush's Georgia campaign. Herbert Jones, Minority Leader of the Georgia Assembly and a member of the Reagan campaign, stated that the Secretary submitted Mr. Belluso's letter of application to the committee, but to his knowledge it was never discussed. Mr. Jones was unaware that plaintiff Belluso had an interest in, or was a member of, the Republican party.

Mr. Belluso testified as to the seriousness of his candidacy and his intent to serve if

elected. He stated that his promise to sit in a rocking chair on the porch of the White House was merely a symbolic way of expressing his belief that government should interfere less in the lives of Americans. Plaintiff presented evidence of his admittance as a Republican candidate in the South Carolina and Alabama primaries.[1] He referred the court's attention to statements in the submitted news articles that his use of gimmickry and a "kookie campaign" was only to attract media attention to his serious side. One headline, for example, states " 'Kooks' Serious About Presidency.' " Defendants' Exhibit # 1. As an indication of his support in Georgia, Mr. Belluso testified that he had received two percent of the vote in the 1978 gubernatorial race, which he entered as a Democrat.[2] Mr. Belluso also asserted that he has a serious ten-point platform that includes such proposals as the institution of a flat-rate income tax, a change to a four-year federal budget, a return to the gold standard, and the opening up of federal lands in the western United States to homesteaders. When asked why he never contacted any other Republican members of the Selection Committee besides Chairman Patton about his candidacy, Belluso said he felt that other members would consider him a threat to their own favorite candidates.

Plaintiff also offered into evidence the packets of materials sent to the Secretary of State by other minor presidential candidates requesting a place on the major parties' ballots. Richard B. Kay sent a letter and an affidavit announcing himself to be a Democratic candidate and attesting to the nationwide media attention he had received. The letter was accompanied by copies of some of the news stories written about his candidacy, and an unfiled complaint threatening Secretary Poythress with the institution of a lawsuit if Kay's name was excluded from the Democratic ballot. Plaintiffs'

Exhibit # 1. Cliff Finch, former Governor of the State of Mississippi, sent only a telegram declaring his candidacy and requesting a place on the Democratic list. Plaintiffs' Exhibit # 2. Benjamin Fernandez sent a letter and copies of news stories about his candidacy that had appeared in such papers as *The New York Times, The Miami Herald,* and *The Seattle Times.* Plaintiffs' Exhibit # 3. The Secretary included Governor Finch's name on the original list, and Mr. Kay and Mr. Fernandez were added by the Selection Committee. Secretary Poythress testified that if he had received Kay's or Fernandez's applications in time, he would have included Fernandez on the original Republican list, and "very likely" would have included Kay on the Democratic list.

Mr. Belluso and the two registered voters who have joined him in this action challenge the Georgia statute underlying the candidate selection process as unconstitutional on its face, and unconstitutional as applied to plaintiff Belluso. Plaintiffs assert they will suffer irreparable harm if Mr. Belluso's name is excluded from the Republican ballot in the March 11th Presidential Preference Primary.

### INJUNCTIVE RELIEF

Plaintiffs seek to enjoin the printing or dissemination of the Republican ballot without Mr. Belluso's name on it. This court may grant plaintiffs the relief they request only if they satisfy four prerequisites:

(1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and

---

1. According to plaintiff's testimony, Alabama requires potential primary candidates to submit a $100 filing fee and a petition signed by 600 registered voters. South Carolina requires only a $1500 fee.

2. The court ruled inadmissible as multiple hearsay the results of a poll taken in Atlanta purportedly showing that of 213 registered voters reached by telephone, 29 had heard of Nick Belluso, but only 5 had heard of the Republican candidate Benjamin Fernandez or the Democratic candidate Richard B. Kay.

(4) that granting the preliminary injunction will not disserve the public interest. *Morgan v. Fletcher*, 518 F.2d at 239 (citations omitted). Because we find that plaintiffs have failed to satisfy the four-pronged test, we must deny plaintiffs' request for injunctive relief.

### 1. *Likelihood of Success on the Merits*

As a threshold matter, the plaintiffs must demonstrate that Belluso's exclusion from the Republican primary ballot constitutes state action, so that they may challenge the exclusion under federal constitutional principles. The defendants argue there is no state action because ultimate control over access to the primary ballots lies with party representatives acting in a purely political, as opposed to governmental, capacity. The plaintiffs respond that as involuntary members of a statutorily created and funded commission, the Republican party representatives act as state officials. The plaintiffs also suggest that even internal party decisionmaking may constitute state action, *see Gray v. Sanders*, 372 U.S. 368, 374–75, 83 S.Ct. 801, 805, 9 L.Ed.2d 821 (1963), and further claim that at least the initial determination of the Secretary of State in drawing up the list involves a governmental act conferring or withholding a tangible benefit. We need not, however, resolve the state action debate here; we will assume the presence of state action and resolve the controversy upon an evaluation of the substantive constitutional considerations presented.

■ Under usual principles of equal protection analysis, a statute is subject only to minimum, or low level, scrutiny unless it draws a suspect classification or infringes a fundamental interest. *See, e. g., City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976). This case involves no suspect classification. Consequently, we may suppose that unless Belluso's right to inclusion on the Republican Presidential Preference Primary ballot (or the remaining plaintiffs' right to have him so included) is constitutionally "fundamental," our only inquiry is one of minimum scrutiny: whether the Georgia provision excluding Belluso rationally advances a legitimate state purpose. We would have little difficulty exonerating Ga.Code § 34–1003a under this standard. On the other hand, if the ballot access right involved is fundamental, its abridgement would be subject to strict scrutiny and would be upheld only if justified by a "compelling state interest" and where no "less restrictive alternative" could attain that interest. *See, e. g., Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 991, 59 L.Ed.2d 230 (1979).

The difficulty here lies in deciding what degree of scrutiny should apply to the Georgia law. Our investigation is complicated by the fact that the cases do not entirely accept the two-tiered equal protection analysis discussed above, under which state action is judged either very strictly or very uncritically. Rather, they identify ballot access rights as being close to, but not quite, fundamental. The cases therefore employ a middle standard of scrutiny which we will conclude is one of "reasonable necessity." Moreover, we will determine that the ballot access right implicated in this case, because it concerns only a primary election, is even less fundamental than that defined in the existing Supreme Court decisions. We will apply a relatively lenient test approaching that of ordinary minimum scrutiny. Under this standard we will conclude that Ga.Code § 34–1003a is neither unduly burdensome nor irrational. We will therefore reject the plaintiffs' claims to its validity under the fourteenth amendment.

The first in the series of ballot access cases both defined the nature of the constitutionally implicated interests and illustrated clearly impermissible burdens on those interests. In *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), the Court struck down particularly harsh restrictions to ballot access for presidential elections. Ohio required any political party that had failed to receive ten percent of the vote in the previous gubernatorial election to file a petition signed by a number of registered voters equal to at least fifteen

percent of the votes cast in that election. The parties had to file their petitions nine months before the election in which they sought to participate; to comply with extensive and costly organizational demands; and to hold primary elections and nominating conventions. With these restrictions—and by prohibiting write-in votes—Ohio virtually excluded minority parties and thus denied them equal protection of the law. The Court identified two interests behind a fourteenth amendment right-to-access rule: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." 393 U.S. at 30, 89 S.Ct. at 10.

Subsequent cases have added precision to the *Williams* rule by identifying permissible or impermissible ballot restriction schemes. The next major decision, *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 127, 27 L.Ed.2d 114 (1971), upheld with little elucidation of relevant constitutional principles, Georgia's five percent petition requirement.[3] *See Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979); *American Party v. White*, 415 U.S. 724, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). Unlike *Jenness*, these cases sometimes characterize the right to ballot access as fundamental and employ the language, if not always the analysis, of strict scrutiny. *See Illinois State Board of Elections v. Socialist Workers Party*, 99 S.Ct. at 992–93 (Blackmun, J., concurring); L. Tribe, *American Constitutional Law* 783 (1978).

■ The justification for restricting access to the ballot is two-fold. The state has a legitimate interest in avoiding "laundry list" ballots that confuse voters and in protecting the integrity of the democratic process from frivolous candidacies. Cases employing strict scrutiny language have termed this state interest "compelling." *See, e. g., Illinois State Board of Elections v. Socialist Workers Party*, 99 S.Ct. at 991.

A thoughtful exposition—and reconciliation—of the conflicting concerns is set forth in *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974). There, the Court invalidated California's requirement that candidates for congressional, state, and county offices pay a nonrefundable filing fee of one or two percent of the annual salary, depending upon the position sought. 415 U.S. at 710, 94 S.Ct. at 1317. The Court held that the state could impose only those limitations "reasonably necessary" to screen out non-serious candidates. Because California left no alternative to the payment of a filing fee, it overburdened access to the ballot:

> Thus, California has chosen to achieve the important and legitimate interest of maintaining the integrity of elections by means which can operate to exclude some potentially serious candidates from the ballot without providing them with any alternative means of coming before the voters. Selection of candidates solely on the basis of ability to pay a fixed fee without providing any alternative means is not reasonably necessary to the accomplishment of the State's legitimate election interests. Accordingly, we hold that in the absence of reasonable alternative means of ballot access, a State may not, consistent with constitutional standards, require from an indigent candidate filing fees he cannot pay.

415 U.S. at 718, 94 S.Ct. at 1321.

■ We adopt the *Lubin v. Panish* rule as a general statement of relevant equal protection analysis. According to that decision, the right to appear on a general election ballot is constitutionally favored but less than fundamental. The right may be burdened, but only by means reasonably necessary to limit the field to serious candidates. "Seriousness" comprehends two factors, the first of which is a candidate's actual popularity and, by implication, his reasonable chances of success. The state may condition access upon the showing of a

---

3. Georgia also imposed a filing fee, which was not contested before the Court. Georgia has since reduced the number of signatures re-
quired from 5 to 2½ percent. *See* Ga.Code § 34–1010(b).

"significant, measurable quantum of community support." *American Party v. White*, 415 U.S. at 782, 94 S.Ct. at 1307. In addition, the state may judge seriousness in terms of a candidate's subjective "desire and motivation." *Lubin v. Panish*, 415 U.S. at 714, 94 S.Ct. at 1319. We next inquire how the rights asserted by the plaintiffs differ from those just defined.

The critical factual distinction between our case and the cases decided by the Supreme Court is that plaintiff Belluso seeks inclusion in a preferential primary that has dubious effect as opposed to a general election that has finality. This distinction has several consequences. The first is that Belluso's exclusion from this particular ballot in no way bars him from running for President. Denied the chance to claim the Republican nomination,[4] Belluso may nevertheless seek the Presidency in the general election independently or as the candidate of a smaller political party. This constitutionally protected right, *see McCarthy v. Askew*, 420 F.Supp. 775, 779 (S.D.Fla.), *aff'd*, 540 F.2d 1254 (5th Cir. 1976), is given effect in Georgia under Ga.Code § 34–1001. Similarly, the right of Belluso's supporters to vote for him in the general election stands unaffected.

The second reason for the lowered importance of the right to inclusion on a primary ballot is the traditionally recognized autonomy of the political party's internal decisionmaking. It is true that certain aspects of the primary process have been subject to careful equal protection scrutiny. *See, e. g., Kusper v. Pontikes*, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973) (invalidating an Illinois party affiliation requirement); *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) (applying the one person-one vote rule to primary elections); *Nixon v. Condon*, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 1301 (1932) (striking down regulations of Texas State Democratic Executive Committee barring blacks from voting in party primaries). But these exceptions involve voting itself and leave undiminished the long-standing respect for the autonomy of political parties. *See Ripon Society v. National Republican Party*, 173 U.S.App. D.C. 350, 525 F.2d 567, 584–86 (D.C.Cir. 1975) (en banc), *cert. denied*, 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976). Parties have long been free to strategize and act—at least before the voting begins—in the closed and clouded atmosphere of the smoke-filled room. Parties exercise rights of free speech and association when they assert this prerogative. *Id.* The plaintiffs' claims are weakened to the extent that the plaintiffs seek constitutional interference with internal party decisionmaking.

Third, we think that first amendment guaranties of free association, which explicitly underly the right-of-access decisions, are less substantial in the present context. Belluso asserts no group's interest in advancing his candidacy. His claimed need to "associate" with an unwilling partner, the Republican party in Georgia, is not a first amendment right. Indeed, to the degree that rights of association are implicated, we think these rights militate in favor of leaving a party free to limit access to its own primary ballot.

Finally, there is much truth in the defendants' characterization of the Georgia Presidential Preference Primary as a "beauty contest." The balloting merely effects a recommendation to the parties, which are free to accept or ignore the results. The plaintiffs' constitutional interest in Belluso's inclusion is decreased because the importance of the primary lies within the discretion of the party.

Because Belluso seeks inclusion on a primary ballot, then, his right to access is even less "fundamental" than if he wished to participate in a general election. The standard of reasonableness by which the Geor-

---

**4.** It is also true that the law merely regulates designation of Georgia delegates to the Republican national convention, so that Belluso may still be nominated if he obtains sufficient support in other states. In examining the validity of the statute, however, we ought to consider that every state could enact similar legislation and that Belluso could, therefore, be precluded from any chance of nomination. Hence, we equate exclusion from the Republican primary ballot in Georgia with denial of the chance to run for the presidency as a Republican.

gia law will be judged is correspondingly lower and approaches the rationality standard of minimum scrutiny. Under this test we find Ga.Code § 34–1003a valid.

■ The facial reasonableness of the Georgia law is established *first* because it is not standardless, or arbitrary, and *second* because it does not of necessity operate to exclude from the primary ballot candidates with a constitutional right to inclusion. The plaintiffs make much of the section's vagueness; its supposed delegation to a single official, the Georgia Secretary of State, of the authority to interpret its meaning; and its allegedly standardless grant of power to exclude even a candidate designated by the Secretary of State to a unanimous trio of party officials. Contrary to these contentions, however, the law does furnish usable guidelines. While Georgia has eschewed the more objective approach taken by states that have imposed filing fees and petition requirements, it has sought a principled means of evaluating a candidate's seriousness, on the theory that his or her recognition in the media demonstrates a minimum degree of public support. Georgia's test may not be the most desirable—it is certainly not the most specific—but it is neither irrational nor even unrealistic. The Secretary of State testified that he implies in section 34–1003a an additional and complementary consideration of a candidate's sincerity. Thus construed, the law contemplates precisely the objective/subjective seriousness inquiry set out in *Lubin v. Panish*, 415 U.S. at 717–19, 94 S.Ct. at 1320–21. Moreover, the Republican party defendants testified that they applied the same test of seriousness as did the Secretary of State, and we think this application is implicitly required by the statute.

Nor does section 34–1003a contain the infirmity that doomed restrictions to ballot access in cases such as *Lubin v. Panish* or *Williams v. Rhodes*. The laws there necessarily kept off the ballot some classes of candidates with constitutional rights to inclusion. Those with sufficient seriousness were excluded by the California law if they could not afford the filing fee and by the Ohio law if they could not produce an oppressively high number of petition signatures or meet other requirements. By contrast, the Georgia law does not inevitably bar any candidate whom the Constitution requires be allowed on the primary ballot.

Because of the absence of inevitable exclusion and because the provision is not wholly arbitrary, we reject the plaintiffs' challenge to the facial validity of Ga.Code § 34–1003a under the forgiving test of equal protection scrutiny we deem applicable. The plaintiffs also claim the law has been unconstitutionally applied. This attack fails because it is unsupported by the evidence presented at the preliminary injunction hearing.

■ The plaintiffs' challenge to Georgia's application of section 34–1003a to Belluso takes two forms. First, they claim that the law has been employed to exclude him from the Republican primary ballot when the seriousness of his candidacy grants him a constitutional right to inclusion. Even under the general election cases, however, Belluso's showing on this account is unpersuasive. The evidence casts grave doubt upon his subjective seriousness, and he has marshalled no facts demonstrating a "significant, measurable quantum of community support," *American Party v. White*, 415 U.S. at 782, 94 S.Ct. at 1307. Because Belluso has made an unsuccessful proffer of his seriousness, he may not assert a right to a place on the Republican ballot.

Second, Belluso contends that section 34–1003a has been applied inconsistently since other candidates permitted on the Republican ballot have less popular support than he. Assuming that such circumstances would violate Belluso's equal protection rights, they have not been proven here. The other contenders submitted materials indicating press coverage of viable and earnest candidacies. By contrast, Belluso's failure to show his own candidacy to be serious dooms his claim of inconsistent application of the law. In sum, we reject the plaintiffs' attack upon Ga.Code § 34–1003a, both on its face and as applied.

### 2. *Irreparable Injury to Plaintiffs*

The state Presidential Preference Primary is scheduled to be held March 11, 1980. Plaintiffs claim that permitting the Republican primary ballot to be printed and distributed without Mr. Belluso's name on it will cause them irreparable injury by prohibiting plaintiffs from voting for Mr. Belluso as a Republican candidate, and by barring Mr. Belluso from being considered as a Republican candidate for President. The court does not find that the alleged present threat of harm to plaintiffs constitutes irreparable injury.

The Secretary of State testified that although the printing of the ballots is "substantially completed," new ballots could be printed on a minimum of seven days notice. Any alleged harm to plaintiffs, therefore, will not become "irreparable" until approximately March 3rd or 4th. Even assuming plaintiffs were to prevail on the merits of their claim, they have not shown they are in sufficient jeopardy to justify the extraordinary remedy of injunctive relief.

### 3. *Harm to Defendants*

In determining the propriety of preliminary injunctive relief, the court must assess the disruptive effect the granting of such relief would have on defendants, and balance that harm against the threatened injury to plaintiffs. Within fifteen days of the date of this order, Georgia will hold the state's Presidential Preference Primary. Secretary of State Poythress testified that the printing of the ballots is "substantially completed." Reprinting the ballots now would cause the state to expend a considerable sum of the taxpayers' money. Without presenting any supporting evidence, defendants' counsel represented to the court that reprinting the ballots would cost the state between $100,000 and $150,000. Balancing the threatened harm to defendants if an injunction issues from this court, against the threatened harm to the plaintiffs, we believe that the tangible risk to defendants is the more substantial.

### 4. *The Public Interest*

Injunctive relief may only be granted if the court determines that such relief will not disserve the public interest. The public has a strong interest in the careful use of its money for worthwhile purposes. Reprinting the primary ballots at this time would cause the expenditure, perhaps needlessly, of substantial public funds. Moreover, for this court to enjoin the printing and distribution of primary ballots pending the addition of plaintiff's name to the ballots would cause considerable disruption in the electoral process. The public also has a strong interest in conducting and participating in an orderly Presidential Preference Primary. The damage to this interest that would be caused by granting plaintiffs the relief they request, when compared to the dubious merits of plaintiffs' claims, requires that injunctive relief be denied.

Accordingly, the court DENIES the plaintiffs' prayer for preliminary injunctive relief. The plaintiffs shall have two days in which to report to the court their intention, if any, to submit further evidence or argument in support of their prayers for permanent injunctive relief, declaratory relief, and money damages. If no report is received within the prescribed two-day period, our conclusion set forth herein that the plaintiffs' constitutional rights have not been abridged shall stand as a final adjudication of all claims in the action and the Clerk of the Court shall enter final judgment in the defendants' favor.

IT IS SO ORDERED.