Gwendolyn PRICE, Plaintiff-Appellant,

v.

Joseph TANNER, Commissioner of Labor of the State of Georgia, et al., Defendants-Appellees.

No. 87-8045.

United States Court of Appeals, Eleventh Circuit.

Sept. 22, 1988.

Rehearing and Rehearing En Banc Denied Nov. 1, 1988.

John F. Sweet, Atlanta, Ga., for plaintiff-appellant.

Bryndis Roberts Jenkins, State Law Dept., Annette M. Cowart, Atlanta, Ga., for defendants-appellees.

Before VANCE and CLARK, Circuit Judges, and GARZA *, Senior Circuit Judge.

VANCE, Circuit Judge:

This appeal involves the issue whether a Georgia Workers' Compensation statute, Ga.Code Ann. § 34–9–285, violates the equal protection clause of the fourteenth amendment to the United States Constitution. Section 34–9–285 provides that where an employee is disabled by the aggravation of a pre-existing condition by an occupational disease, workers' compensation benefits are limited to an amount representing the portion of disability attributable to the occupational disease. Georgia's Workers' Compensation Act, however, does not contain a similar provision limiting benefits to employees disabled by the aggravation of pre-existing conditions by work-related occurrences, such as accidents or injuries, other than occupational diseases. Finding that the statute is rationally related to a legitimate state interest, the district court granted summary judgment in favor of appellees. We affirm.

I.

During her childhood Gwendolyn Price suffered from numerous respiratory problems. In 1971, she was diagnosed as having chronic bronchiectasis disease. Two years later, Price began working for Lithonia Lighting Company. Over the course of her employment at Lithonia Lighting Price was exposed to fumes, chemicals and dust which aggravated her respiratory condition. Due to her continuing respiratory problems, Price had to leave her job in January 1983.

Price filed a claim for workers' compensation benefits on January 11, 1983 with the State Board of Workers' Compensation. An administrative law judge ("ALJ") found that Price had "sustained an accident arising out of and in the course of her employment which aggravated her pre-existing lung problem." Finding that Price was totally disabled, the ALJ awarded her $135 per week for total economic disability plus medical expenses. Lithonia Lighting appealed the ALJ's decision to the full board of the State Board of Workers' Compensation. On appeal it was determined that only ten percent of Price's disability was attributable to the aggravation of her condition as a result of her employment. Accordingly, Price's award was reduced to $13.50 per week pursuant to section 34–9–285.[1]

Price sought review of the administrative award in the state courts. After the Superior Court of Rockdale County, Georgia affirmed the award, Price filed an application for a discretionary appeal to the Georgia Supreme Court challenging the constitutionality of section 34–9–285. The Georgia Supreme Court upheld the constitutionality of the statute. See Price v. Lithonia Lighting Co., 256 Ga. 49, 343 S.E.2d 688 (1986).[2]

* Honorable Reynaldo G. Garza, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. Ga.Code Ann. § 34–9–285 provides in part: Where an occupational disease is aggravated by any other disease or infirmity not itself compensable or where disability or death from any other cause not itself compensable is aggravated, prolonged, accelerated, or in any other wise contributed to by an occupa-

tional disease, the compensation payable shall be reduced and limited only to such proportion of the compensation that would be payable if the occupational disease were the sole cause of the disability or death as such occupational disease, as the causative factor, bears to all the causes of such disability or death.

2. While it held that section 34–9–285 was constitutional, the Georgia Supreme Court vacated the award and remanded the case to the superior

While awaiting the resolution of the state court proceedings, Price instituted this action in federal district court alleging that section 34–9–285 violated her federal constitutional rights.[3] Price maintained that section 34–9–285 violated the equal protection clause of the fourteenth amendment because of the statute's restrictive rule for determining benefits for persons disabled due to the aggravation of a pre-existing condition by an occupational disease. In the complaint, Price alleged that "[t]here is no rational basis for the distinction drawn by [the] statute between disability resulting from occupational factors and disability resulting from all other aggravating factors." The district court held that there was a rational basis for the distinction.[4] The district court found that the rational basis test was satisfied by the two justifications asserted by the state: (1) to alleviate a financial strain on certain industries; and (2) to recognize the problem arising from the gradual onset of occupational diseases of determining when the aggravation of a pre-existing condition becomes the cause of the disability. This appeal followed.

## II.

The equal protection clause of the fourteenth amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. A violation of the equal protection clause may occur when a legislative body enacts a law which "has a special impact on less than all the persons subject to its jurisdiction...." *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 587–88, 99 S.Ct. 1355, 1367, 59 L.Ed.2d 587 (1979). The Supreme Court, however, consistently has recognized that "the Fourteenth Amendment does not deny to states the power to treat different classes of persons in different ways." *Reed v. Reed*, 404 U.S. 71, 75, 92 S.Ct. 251, 253, 30 L.Ed.2d 225 (1971). An equal protection analysis, therefore, requires as a "preliminary step" a determination of "whether persons who are similarly situated are subject to disparate treatment." *Johnson v. Smith*, 696 F.2d 1334, 1336 (11th Cir.1983).

Georgia's Workers' Compensation Act (the "Act"), Ga.Code Ann. §§ 34–9–1 *et seq.*, does not compensate all disabled employees in the same manner. Employees receive full compensation for compensable disabilities arising solely as a result of a work-related injury,[5] solely as a result of an occupational disease,[6] or as a result of the aggravation of a pre-existing condition by a work-related injury other than an oc-

court with an instruction that pursuant to Ga. Code Ann. § 34–9–261 an award of $25 per week be substituted. *Price*, 343 S.E.2d at 692.

**3.** The district court found that appellant expressly reserved her right to seek redress of her federal constitutional claims by informing the state court of her intent. *See England v. Louisiana State Bd. of Medical Examiners*, 375 U.S. 411, 419, 421–22, 84 S.Ct. 461, 466–67, 467–68, 11 L.Ed.2d 440 (1964) (by informing the state court of an intention to return to federal district court should the state court decision be unfavorable, a party preserves the right to litigate federal claims in federal district court).

**4.** In the motion for summary judgment, appellees initially requested the court to abstain from exercising its jurisdiction. Stating that the abstention doctrine does not operate where, as in this action, the state court proceedings have concluded, the district court found that abstention was inappropriate. *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). The district court also rejected appel-

lee's argument that the action was barred by the doctrine of *res judicata*. The court reasoned that because the Georgia Supreme Court decision does not clearly indicate whether the federal constitutional issue was decided and appellant expressly reserved her right to litigate the federal claim in a federal court, the doctrine of *res judicata* also was inappropriate. Neither of these findings were appealed to this court, and we do not address them.

**5.** The Act defines "injury" as "only injury by accident arising out of and in the course of employment and shall not, except as hereinafter provided, include a disease in any form except where it results naturally and unavoidably from the accident." Ga.Code Ann. § 34–9–1(4).

**6.** The Act provides a list of diseases considered as occupational diseases provided such listed disease "is due to causes and conditions which are characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease....." Ga.Code Ann. § 34–9–280(3).

cupational disease. If, however, an employee is disabled by the aggravation of a noncompensable, pre-existing condition by an occupational disease, compensation is reduced to the proportion the occupational disease is the cause of the disability. Ga. Code Ann. § 34–9–285. Employees who are disabled due to the aggravation of pre-existing conditions are similarly situated with other disabled employees with respect to the purpose of the legislation. Because the compensation for these disabled employees is calculated in a different manner, we find that the preliminary step is satisfied.

Where groups are similarly situated "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979). Where the classification interferes with the exercise of a fundamental right or operates to the disadvantage of a suspect class, an equal protection analysis requiring strict scrutiny is substituted for the general rule. *City of Cleburne,* 105 S.Ct. at 3255; *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566–67, 49 L.Ed.2d 520 (1976).

The parties agree that the standard of review applicable to this case is the "rational basis" test.[7] Under this test "we will not overturn ... a statute unless the varying treatment of different ... persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Vance,* 440 U.S. at 97, 99 S.Ct. at 943, *see Western & S. Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 674, 101 S.Ct. 2070, 2086, 68 L.Ed.2d 514 (1981) (equal protection challenge will not succeed if the state's purpose is legitimate

and the rational relationship question is "'at least debatable'") (quoting *United States v. Carolene Prods. Co.,* 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938)). The application of the rational basis test to social or economic legislation "allows the states wide latitude." *City of Cleburne,* 105 S.Ct. at 3254; *see United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 174, 101 S.Ct. 453, 459, 66 L.Ed.2d 368 (1980); *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 1104–05, 6 L.Ed.2d 393 (1961).

The state asserts that section 34–9–285 ensures three legitimate state purposes: (1) to alleviate a heavy financial burden on industries where individuals are likely to file more claims; (2) to recognize that occupational diseases have a gradual onset making it difficult to determine when an aggravating injury actually occurs; and (3) to encourage the employment of handicapped persons. We note that appellees have not provided great assistance to this court by identifying compelling reasons for the legislation. We have some question that either of the first two justifications may be classified as a legitimate state interest.[8] Because only one reason, however, is necessary to sustain the statute, *see Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 465, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981), we turn to the third purpose advanced by the state.

The third justification offered by appellees initially was presented to this court during oral argument. Although this argument was not presented to the district court, we are obligated under the rational basis test to consider any legitimate state interest however it comes before us. *See Western & S. Life Ins. Co.,* 451 U.S. at 674, 101 S.Ct. at 2086 (in determining the validity of legislation under the equal protection clause the court may analyze considerations presented to the state legislature and those of which it takes judicial notice) (quoting *Carolene Products Co.,* 304 U.S.

---

7. Appellant did not allege the existence of any fundamental right or a suspect class so the rational basis test is appropriate.

8. Even assuming that the second justification is legitimate, we believe that rather than alleviating this causation problem, the proportional compensation scheme of section 34–9–285 actually creates the problem advanced by the state.

at 154, 58 S.Ct. at 784–85); *Dandridge v. Williams,* 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156–57 n. 6, 25 L.Ed.2d 491 (1970) (an appellee may assert any justification in support of a judgment in its favor "whether or not that ground was relied upon or even considered by the trial court").

The third justification offered by appellees provides a basis for sustaining section 34–9–285. This justification, encouraging the employment of the handicapped, is a legitimate state interest. *See Dandridge v. Williams,* 397 U.S. 471, 486, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970). Furthermore, as appellees maintain, the statute is rationally related to this objective. We believe that the Georgia legislature could reasonably find that the employment of persons afflicted with occupational diseases could be enhanced by reducing employers' potential exposure to extraordinary compensation costs resulting from such preexisting diseases.

Appellant does not question the justifications asserted by the state. Rather, appellant asserts that the disparate treatment of employees disabled by the aggravation of a pre-existing condition is not relevant to the state's purpose of providing support for all disabled persons. Appellant argues that the "etiology of an injury" should not limit the amount of compensation because any disability affects a person's earning capacity. The equal protection analysis, however, does not require this court to determine whether the legislation will fully achieve its articulated purposes. *Clover Leaf Creamery Co.,* 449 U.S. at 466, 101 S.Ct. at 725. As a federal court we "do not sit as arbiters of the wisdom or utility of these laws." *Alamo Rent–A–Car, Inc. v. Sarasota–Manatee Airport Auth.,* 825 F.2d 367, 370 (11th Cir.1987), *cert. denied* —— U.S. ——, 108 S.Ct. 1022, 98 L.Ed.2d 987 (1988). Instead, our sole inquiry is whether the Georgia legislative "could rationally have decided" that its purpose would be achieved. *Clover Leaf Creamery, Co.,* 449 U.S. at 466, 101 S.Ct. at 725. We, therefore, hold that section 34–9–285 is rationally related to a legitimate state interest and does not violate the fourteenth amendment's equal protection clause.[9]

AFFIRMED.

CLARK, Circuit Judge, dissenting:

My disagreement with the majority is a narrow one. I agree that the State's claim that § 34–9–285 does not violate the equal protection clause is untenable: (1) on the ground that the statute was intended to alleviate a financial burden from those industries in which employees are likely to sustain more injuries, and (2) on the basis that occupational diseases have a gradual onset thus making it difficult to determine when an aggravating injury actually occurs. I also agree with the majority that Georgia workers who contract occupational diseases are denied equal protection of the law. The only issue of difference between us is whether there is any rational basis for concluding that § 34–9–285 encourages the employment of the handicapped.

In equal protection cases "the mere recitation of a benign compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." *Weinberger v. Wiesenfeld,* 420 U.S. 636, 648, 95 S.Ct. 1225, 1233, 43 L.Ed.2d 514 (1975). A court need not "accept at face value assertions of legislative purpose ... when an examination of the legislative scheme and its history demonstrate that the asserted purpose could not have been a goal of the legislation." 420 U.S. at 648 n. 16, 95 S.Ct. at 1233 n. 16. *See also Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 463 n. 7, 101 S.Ct. 715, 723 n. 7,

---

**9.** We wish to emphasize that it is not difficult to satisfy the rational basis test. *Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 881, 105 S.Ct. 1676, 1683, 84 L.Ed.2d 751. Indeed, we do not decide that section 34–9–285 "is wise, that it best fulfills the relevant social and economic objectives that [Georgia] might ideally espouse, or that a more just and humane system could not be devised." *Dandridge,* 397 U.S. at 487, 90 S.Ct.

at 1162. Arguably a more equitable result could be achieved if the Georgia legislature amended this provision to provide full compensation to employees disabled as a result of occupational diseases. As the Supreme Court noted "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne,* 105 S.Ct. at 3254.

66 L.Ed.2d 659 (1981) (applying *Weinberger*).

The majority makes the following statement and demonstrates a clairvoyance beyond my ken:

We believe that the Georgia legislature could reasonably find that the employment of persons afflicted with occupational diseases could be enhanced by reducing employers' potential exposure to extraordinary compensation costs resulting from such preexisting diseases.

Maj.Op. at page 826. A review of the history of the Georgia Workers' Compensation statute demonstrates that the Georgia legislature could not have contemplated such a purpose in enacting § 34–9–285.

### I. The 1920 Act.[1]

In 1920 Georgia enacted its first statute which limited the financial liability of employers for injuries growing out of accidents during employment and provided benefits for all workers injured by accident arising from the employment whether or not the employer was responsible for the injury.

The Act limited compensation in cases where an injury aggravated an employee's preexisting injury or disability:

If an employee who suffers an injury in his employment has a permanent disability or has sustained a permanent injury ... suffered elsewhere, he shall be entitled to compensation only for the degree of incapacity which would have resulted from the later accident if the earlier disability or injury had not existed.

1920 Ga.Laws 167, 186, § 34, Ga.Code § 114–408 (1933). Georgia courts interpreted § 114–408 "so as 'to subject employers only to liability for ... injuries resulting to employees during the time of ... employment' and not to compensate the employee as if the prior injury had never occurred." *Barry v. Aetna Life & Casualty Co.*, 133 Ga.App. 527, 211 S.E.2d 595,

599 (1974) (citations omitted). *See e.g., Georgia Insurance Service v. Lord*, 83 Ga. App. 28, 62 S.E.2d 402, 404–05 (1950) (employee who was blind in his right eye prior to losing the vision in his left eye as a result of a work-related injury could recover workers' compensation benefits only for the blindness in his left eye).

The Georgia Workers' Compensation Act provided compensation only for "injuries" occurring out of and in the course of employment. The term "injury" did not encompass occupational diseases: "'injury' and 'personal injury' ... shall not include a disease in any form except where it results naturally and unavoidably from [an] accident." 1920 Ga.Laws § 2(d), Ga.Code § 114–102 (1933).

Despite the failure of the Act to compensate for occupational diseases, employees beset with such diseases were not left without a remedy for their disability. In 1936, the Georgia Supreme Court stated:

The remedy provided by [the Act] is exclusive within the field of its operation, but it does not exclude redress in cases to which it is not applicable. Consequently, if [the Act] does not apply to an "occupational disease" ... the employee may maintain an ordinary or common law action for damages against his employer, provided a cause of action exists in his favor relating to the liability of a master, independently of the [Act].

*Covington v. Berkeley Granite Corp.*, 182 Ga. 235, 184 S.E. 871, 872 (1936). A year later, the court made it clear that a common law action for damages against an employer could be maintained by an employee who had been disabled by silicosis because occupational diseases were not compensable under the Act. *See Berkeley Granite Corp. v. Covington*, 183 Ga. 801, 190 S.E. 8, 12 (1937).

### II. The 1946 Act.

In 1946, the Georgia legislature amended the Act by adding to it a chapter on occupa-

---

1. Explanation of citation to Georgia Statutes. While there have been seven official codifications of Georgia laws only two are applicable here, the 1933 Code and the 1981 Code. Citation will be to the statutes and both codes unless a statute has been repealed, in which instances the 1981 Code will not be cited. Parenthetically, the Act involved here was originally titled "Workmen's Compensation Act" but is now titled "Workers' Compensation." These may be used here interchangeably.

tional diseases. 1946 Ga.Laws 103 *et seq.* The new chapter limited compensable occupational diseases to poisoning (by 22 chemicals or substances), x-rays or radioactive substances, asbestosis, and silicosis. Ga. Code § 114–803 (1946). As it does today in § 34–9–285, the chapter on occupational diseases apportioned compensation in cases where an occupational disease aggravated an employee's preexisting noncompensable infirmity or condition or where an employee's noncompensable infirmity or disease aggravated his preexisting occupational disease.[2] Since in 1946 all other injuries that aggravated preexisting permanent injuries or disabilities were not fully compensated, *supra* at I. The 1920 Act, the apportionment of compensation in aggravation of occupational disease cases *resulted in equal treatment* for all Georgia employees.

From 1946 until 1978 there was no denial of equal protection of the laws to the workers in Georgia, *i.e.,* no disparate treatment during those 32 years with respect to compensation to employees who had preexisting injuries, conditions, or diseases. Although enactment of the 1946 statute added to the scope of the Workers' Compensation statute those employees who contracted occupational diseases while at work, there is nothing to support the pure conjecture by the majority, (and by the State of Georgia attorney who first raised the subject at oral argument) that the 1946 statute was passed for the purpose of encouraging the employment of handicapped workers who had an occupational disease or a condition that would be aggravated by certain types of working conditions. Instead, one objective of the 1946 statute was to eliminate the unlimited recovery an employee might receive in a common law action such as *Covington v. Berkeley Granite Corp.,*

*supra.* Another logical objective was to provide coverage for injured workers who might not recover in a common law action.

Nor does the statute encourage the employment of the handicapped as is refuted by Ms. Price's case. Ms. Price had bronchiectasis, which is "a chronic inflammatory or degenerative condition of one or more of the bronchi marked by dilation and loss of elasticity of the [bronchi] walls." Webster's Unabridged Third New International Dictionary 282 (1976). When Ms. Price was employed by Lithonia Lighting Company, there is no evidence that Lithonia Lighting asked Price about her health when it hired her or otherwise knew that she had bronchiectasis. Nor is there any evidence that Price suspected that her bronchiectasis would be aggravated by working at Lithonia Lighting. While employed at Lithonia Lighting, Price worked over a tank of acid and was exposed to paint fumes and gases given off by wood alcohol. The working conditions aggravated her respiratory problems, and she was forced to leave Lithonia Lighting in January of 1983. The majority states the following: We believe that the Georgia legislature could reasonably find that the employment of persons afflicted with occupational diseases could be enhanced by reducing employers' potential exposure to extraordinary compensation costs resulting from such preexisting diseases. Ms. Price was not afflicted with a preexisting occupational disease when employed by Lithonia Lighting. Employment of the "handicapped" was not a decisional factor in her being employed.

### III. The 1977–78 Acts.

In 1977 the Georgia legislature added a section to the Workers' Compensation statute, Ga.Laws 1977, Vol. 1 at 608. "Chapter

---

**2.** Where an occupational disease is aggravated by any other disease or infirmity not itself compensable or where disability or death from any other cause not itself compensable is aggravated, prolonged, accelerated, or in any other wise contributed to by an occupational disease, the compensation payable shall be reduced and limited only to such proportion of the compensation that would be payable if the occupational disease were the sole cause of the disability or death as such occupational disease, as the causative factor, bears to all the causes of such disability or death. Compensation shall be adjusted by reducing the number of weekly payments or the amounts of such payments as, in the circumstances of the particular case, may be determined by the board.
Ga.Code § 114–805 and § 34–9–285.

114–9. Subsequent Injury." The preamble to the statute states in part: "An Act to amend Code Title 114, relating to workmen's compensation, as amended, so as to encourage the employment of handicapped persons by protecting employers for excess liability for compensation for certain injuries; . . ." This statute is now codified as § 34–9–350, *et seq.*

The statute creates a Subsequent Injury Trust Fund and authorizes assessments against insurers or self-insurers according to a formula based upon the total workers' compensation claims paid by an insurer or self-insurer as those claims bear to the total workers' compensation claims paid by all insurers and self-insurers in the state during the preceding calendar year. The purpose of the Fund is to make available money to reimburse insurers or self-insurers for a portion of the medical expenses and income benefit payments to employees who have sustained an injury which impaired and merged with a preexisting injury. In the first instance, the employer or insurer pays the employee the amount of compensation benefits owed and then is reimbursed by the fund according to a formula set forth in the statute.

### IV. The 1978 Statute.

The 1977 statute as such did not encourage employment of handicapped workers because § 114–408 was not repealed until 1978. Section 114–408, *supra* at page 825, forbade payment of compensation for any portion of disability allocable to a preexisting disability or injury. In 1978, the Legislature repealed existing § 114–408 (along with §§ 114–409 and 114–410) and, to give life to the 1977 Act, substituted a new § 114–408 entitled "subsequent injury" which included the following:

(c) *Total disability by subsequent injury.*

(1) An employee who has a prior disability as described in Article 9 of this chapter and who sustains a subsequent injury which combines with the prior injury to produce total disability shall be entitled to income benefits as provided in Code Section 34–9–261. The loss of both hands, feet, arms, legs, or the loss of any two of them or the total loss of vision of both eyes shall be presumed to be total disability, subject to rebuttal.

(2) An employer who makes payment under this subsection shall be entitled to reimbursement as determined under Article 9 of this chapter.

1978 Ga.Laws 2220, § 6 (codified as Ga. Code § 34–9–241(c)).

The legislature did not repeal that part of the 1946 Occupational Disease Act (now § 34–9–285) which apportioned compensation benefits by limiting payment by employers to those employees having a preexisting disease for only that part of the disabling disease allocable to the claimant's employment. The Georgia law as it now stands authorizes full compensation to employees whose disabling injury merges with a preexisting injury and results in total disability. The change in law is illustrated by reference to *Georgia Insurance Service v. Lord, supra* at page 825, in which case the court held that the employee who was blind in his right eye prior to losing his vision in his left eye as the result of a work-related injury could recover only partial disability compensation for blindness in his left eye. An employee under identical circumstances would now be compensated for total disability.

Employees with a preexisting condition or disease who become totally disabled by virtue of an occupational disease do not receive full compensation. Ms. Price's receipt of only the minimum compensation of $25.00 per week instead of $135.00 per week is the result of the failure of the Legislature in 1978 to repeal § 114–805 (now § 34–9–285). The disparity in treatment of persons situated as Ms. Price, as compared with those such as an employee who loses sight in his only good eye, led to this lawsuit to declare unconstitutional the statutes as applied to those employees who become totally disabled by virtue of occupational diseases and yet receive only partial compensation. The majority in the second paragraph of Part II acknowledges the disparate treatment and that the statutory scheme is unconstitutional unless there is a

"rational basis" for the difference in treatment.

The foregoing history and current status of the Georgia law establish beyond dispute that the majority's "rational basis" for the disparate treatment of workers who contract occupational diseases is mere sophistry. The 1946 Act (§ 34-9-285) was not enacted to encourage employers to hire the handicapped. That Act limited the compensation to the extent the disease was attributable to the employment. The 1920 Act (§ 114-408) similarly limited compensation where an injury was superimposed on a prior condition. It is obvious from the legislative history that the Georgia Legislature did not enact legislation to encourage employment of the handicapped until 1977. This was 31 years after passage of the statute here under attack.

Under the rational basis test, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* 473 U.S. at 440, 105 S.Ct. at 3254 (citations omitted).[3] That recognition is only the beginning of the inquiry, for the rational basis test has long been a source of confusion and debate. *See, e.g., United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 176 n. 10, 101 S.Ct. 453, 460 n. 10, 66 L.Ed.2d 368 (1980) ("The most arrogant legal scholar would not claim that [our] cases applied a uniform or consistent test under equal protection principles."); *Schweiker v. Wilson*, 450 U.S. 221, 243 n. 4, 101 S.Ct. 1074, 1087 n. 4, 67 L.Ed.2d 186 (1981) (Powell, J., dissenting) ("The Court has employed numerous formulations for the 'rational basis' test. Members of the Court continue to hold divergent views on the clarity with which a legislative purpose must appear, and about the degree of deference afforded the legislature in suiting means to ends.") (citations omitted). The disagreement over the meaning of the rational basis test is understandable. However well its language may read, the test in the end depends for its application upon words such as "arbitrary," "legitimate," and "rational," which are subject to many differences of opinion. *Accord Illinois State Bd. v. Socialist Workers*, 440 U.S. 173, 188-89, 99 S.Ct. 983, 992, 59 L.Ed.2d 230 (1979) (Blackmun, J., concurring) ("[P]hrases [such as 'compelling state interest' and 'least drastic means'] are really not very helpful for constitutional analysis. They are too convenient and result oriented."). Nevertheless, certain general propositions about equal protection and rational basis bear repeating.

First, the rational basis test requires more than a mere connection between means and ends. "[T]he objectives of a legislative classification can be characterized on different levels of generality.... As one moves to higher levels of generality, the likelihood of finding rational grounds for distinction increases." Brest & Levinson, *Processes of Constitutional Decisionmaking* 560-61 (1983). This is because any regulation can be validated through the use of sophistry or a non sequitur:

> It is always possible to define the legislative purpose of a statute in such a way that the statutory classification is rationally related to it.... The nature of the burdens or benefits created by a statute and the nature of the chosen class's commonality will always suggest a statutory purpose—to so burden or benefit the common trait shared by members of the identified class. A statute's classification will be rationally related to such a purpose because the reach of the purpose has been derived from the classifications themselves.

Note, *Legislative Purpose, Rationality, and Equal Protection*, 82 Yale L.J. 123, 128 (1972). *Cf.* Tribe, *American Constitutional Law* 995 (1978) (without requiring a legitimate public purpose, "it would seem useless to demand and discover even the most perfect congruence between means

---

**3.** Thus, the test "contains two substantive limitations on legislative choice: legislative enactments must implicate legitimate goals, and the means chosen by the legislature must bear a rational relationship to those goals." *Lyng v. International Union*, — U.S. —, —, 108 S.Ct. 1184, 1194, 99 L.Ed.2d 380 (1988) (Marshall, J., dissenting).

and ends, for each law would supply its own indisputable fit: if the means chosen burdens one group and benefits another, then the means perfectly fit the end of burdening just those whom the law disadvantages and benefitting just those whom it assists"); *Fritz*, 449 U.S. at 180, 101 S.Ct. at 462 (Stevens, J., concurring) ("if the analysis of legislative purpose requires only a reading of the statutory language in a disputed provision, and if any 'conceivable basis' for a discriminatory classification will repeal a constitutional attack on the statute, judicial review will constitute a mere tautological recognition of the fact that Congress did what it intended to do"). For example, a statute requiring the installation of exhaust emission devices on blue cars has a tautological objective—reducing emissions on blue cars—but it cannot seriously be argued that such a statute passes constitutional muster: "such self validation is obviously inconsistent with any criterion for rationality." Brest & Levinson, *Processes of Constitutional Decisionmaking* 560 (1983). *See Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 882 n. 10, 105 S.Ct. 1676, 1684 n. 10, 84 L.Ed.2d 751 (1985) (rejecting state's contention that *"any"* discrimination subject to the rational relation level of scrutiny could be justified simply on the ground that it favored one group at the expense of another").

Second, it is axiomatic that "[n]o bright line divides the merely foolish from the arbitrary law." *Schweiker*, 450 U.S. at 243, 101 S.Ct. at 1087 (Powell, J., dissenting). As a result, each equal protection case turns on its particular factual scenario. *Liberty Warehouse Co. v. Burley Tobacco Growers Co-op*, 276 U.S. 71, 91, 48 S.Ct. 291, 295, 72 L.Ed. 473 (1928). *See also Salyer Land Co. v. Tulare Lake Basin Water Storage District*, 410 U.S. 719, 725, 93 S.Ct. 1224, 1228, 35 L.Ed.2d 659 (1973) ("In determining whether or not a state law violates the Equal Protection clause, we must consider the facts and circumstances behind the law, the interests which the State claims to be protecting,

and the interests of those who are disadvantaged by the classification.") (citation omitted).

Third, the equal protection clause is not static. Because the clause is not "shackled to the political theory of a particular era, ... [n]otions of what constitutes equal protection ... *do* change." *Harper v. Virginia State Board*, 383 U.S. 663, 669, 86 S.Ct. 1079, 1083, 16 L.Ed.2d 169 (1966). *See, e.g., Brown v. Board of Education*, 347 U.S. 483, 494–95, 74 S.Ct. 686, 691–92, 98 L.Ed. 873 (1954) (holding that the "separate but equal" doctrine of *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) was unsupported by modern authority).

Fourth, the rational basis test is "not a toothless one." *Mathews v. Lucas*, 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed. 2d 651 (1976). In recent cases, the Supreme Court has carefully analyzed the legitimacy of asserted state purposes, *e.g., Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985) and *Zobel v. Williams*, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982), in assessing the rationality of a statute. If no legitimate state purpose is served, there is then no rational basis for creating the unequal classifications in the challenged statute. The Court has also closely scrutinized the means/ends nexus of legislative classifications, *e.g., Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed. 2d 313 (1985) and *Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985), in striking down state classifications. In addition, the Court has reviewed legislative records and other relevant evidence bearing on the rationality of a particular classification. *See, e.g., Cleburne Living Center*, 473 U.S. at 447–50, 105 S.Ct. at 3258–60; *Western & Southern Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 670–74, 101 S.Ct. 2070, 2084–86, 68 L.Ed.2d 514 (1981); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464–70, 101 S.Ct. 715, 724–27, 66 L.Ed.2d 659 (1981).[4]

---

**4.** Whatever the reach of the rational basis test, it seems safe to say that the test, as applied today, is not always as deferential as it was in cases like *Williamson v. Lee Optical Co.*, 348 U.S. 483,

In *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972), a Louisiana workers' compensation statute denying death benefits to dependent, unacknowledged, and illegitimate children of deceased employees was challenged on equal protection grounds. The Supreme Court, applying the rational basis test,[5] held that the statute violated the equal protection clause. The defendant insurance company had argued, among other things, that the statute was constitutional because it lessened the possible problems of locating illegitimate children and determining uncertain claims of parenthood. The Court reviewed that argument in light of the *overall* purpose of the Louisiana workers' compensation scheme and stated that while it "fully respect[ed] Louisiana's choice on [that] matter, ... the inferior classification ... [bore] no significant relationship to those recognized purposes of recovery [i.e., providing compensation to disabled employees and their families] which workmen's compensation statutes commendably serve." *Id.* at 174–75, 92 S.Ct. at 1406.

As did the Court in *Weber*, we think it is proper to evaluate § 34-9-285's rationality in light of the overall goal of the Georgia Workers' Compensation Act. The Georgia courts have consistently held that the Act is " 'a humanitarian measure' providing relief to the injured employee and protecting employers from excessive damage awards." *Koger Properties, Inc. v. Adams–Cates Co.*, 247 Ga. 68, 274 S.E.2d 329 (1981) (citation omitted). Even if § 34-9-285 by its operation suggested the purpose of encouraging employment of the handicapped as contended by the majority, § 34-9-285 is inconsistent with the overriding purpose of the Act.

The maximum compensation limits placed on injured employees under the Act already serve the purpose of "protecting employers from excessive damage awards." Even if a disabled employee can recover the maximum benefits under the Act, such benefits are bound to be less than his previous salary. *See* Ga.Code Ann. § 34-9-261(a) (1987) (in cases of total disability, the employee shall be paid a "weekly benefit equal to two-thirds of [his] average weekly wage but no more than $155.00 per week"). Consequently, § 34-9-285 provides a windfall for employers engaged in those industries where those few employees with preexisting conditions are disabled because of occupational diseases. By apportioning income compensation only in cases where preexisting conditions have been aggravated by occupational diseases, § 34-9-285 denies workers like Ms. Price the full measure of workers' compensation benefits while at the same time benefiting those industries most likely to injure employees. This inequity is a far cry from the underlying theory of workers' compensation—that "the cost of the product should bear the blood of the workman." Prosser, *Handbook of the Law of Torts* 530 (5th ed. 1971).

Like all other insurers, workers' compensation insurers rate employers according to risk factors: "Theoretically, employers are charged a premium based on the relative safety of their workplaces as measured by reported employee injuries and illnesses. ... Employers will therefore engage in preventive safety efforts only as long as such efforts are less costly than the payments they must make to the workers' compensation fund." Schroeder & Shapiro, *Responses to Occupational Disease: The Role of Markets, Regulation, and Infor-*

75 S.Ct. 461, 99 L.Ed.2d 563 (1955). *See Cleburne Living Center,* 473 U.S. at 458, 105 S.Ct. at 3264 (Marshall, J., concurring) ("however labeled, the rational basis test invoked today is most assuredly not the rational basis test of *Williamson* ... and [its] progeny").

**5.** Although the Supreme Court in *Weber* was somewhat unclear as to the standard of review it used, *see* 406 U.S. at 172–73, 92 S.Ct. at 1405, it relied on *Levy v. Louisiana,* 391 U.S. 68, 71, 88 S.Ct. 1509, 1511, 20 L.Ed.2d 436 (1968), a case

which employed the rational basis test. The *Weber* Court was, of course, motivated by a concern over the condemnation of illegitimate children simply because of their status, but it did not hold that classifications involving illegitimate children were subject to heightened scrutiny. Even if *Weber* involved a more searching scrutiny, however, its approach is consistent with the rational basis test applied by the Court in recent cases such as *Cleburne Living Center.*

*mation*, 72 Geo.L.J. 1231, 1245 (1984). The apportionment of occupational disease claims, coupled with the structure of the insurance system and the difficulty of proving such claims, provide disincentives for employers to eliminate or control such diseases, *id.* at 1245–47, thus leading to a vicious circle of more disabled workers. It seems difficult to square this result with any notion of rationality or with the theory behind workers' compensation. As Professor Larson has noted, the general rule is that when a preexisting condition is aggravated by a work-related occurrence, the *entire* disability is compensable. 1B Larson, *The Law of Workmen's Compensation* § 59.22(a) (1987). *See also Griggs v. Lumbermen's Mutual Casualty Co.*, 61 Ga.App. 448, 6 S.E.2d 180 (1939) ("It is not necessary, in order for an employee to recover compensation as an injured workman, that he must have been in perfect health or free from disease at the time he received the injury. Every workman brings with him to his employment certain infirmities; his employer takes him as he finds him and assumes the risk of a diseased condition aggravated by injury."), *aff'd* 190 Ga. 277, 9 S.E.2d 84 (1940).

Given the high risk of injury or disability faced by employees in industries with occupational diseases, and the inability of those employees to pursue tort actions against their employers, § 34–9–285 is not rationally related to the overall legitimate purpose of the Act: providing sustenance to disabled employees.

Assuming *arguendo* that the purpose of § 34–9–285 was to encourage the employment of handicapped persons, § 34–9–285 violates the equal protection clause because it is not rationally related to that purpose. It is ludicrous to suggest that discrimination *only* against employees disabled by aggravating occupational diseases rationally furthers the encouragement of handicapped persons.

In *Williams v. Vermont*, 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985), car buyers who bought and registered their cars outside of Vermont before becoming Vermont residents filed suit challenging, on equal protection grounds, Vermont's requirement that they pay a full use tax in order to register their cars in the state. Under the Vermont statutory scheme, the state collected a use tax when a car was registered with it but not if the car was purchased in Vermont and the buyer had paid a sales tax. The tax was reduced by the amount of any sales or use tax paid to another state if the state would afford a credit for taxes paid to Vermont in similar circumstances. The credit, however, was available only if the person registering the car was a Vermont resident at the time he paid the taxes. *Id.* at 15, 105 S.Ct. at 2468. Vermont argued, in part, that the statute was constitutional because it was consistent with the state's policy that those persons using the roads should pay for them. The Supreme Court disagreed: "This 'basic policy' arguably supports imposition of the use tax on [out-of-state car buyers], and the denial of a credit to them; *but it provides no rational reason to spare Vermont residents an equal burden.*" *Id.* at 25–26, 105 S.Ct. at 2473. The reasoning of *Williams* is applicable here. If encouraging the employment of handicapped employees is the goal of § 34–9–285, there is no rational justification for attempting to accomplish that goal with an uneven hand by burdening only those employees whose preexisting conditions are aggravated by occupational disease. *Cf. Shapiro v. Thompson*, 394 U.S. 618, 637–38, 89 S.Ct. 1322, 1333, 22 L.Ed.2d 600 (1969) ("A state purpose to encourage employment provides no rational basis for imposing a one-year waiting period restriction [for welfare eligibility] on new residents only."); *Aladdin's Castle, Inc. v. City of Mesquite*, 630 F.2d 1029, 1039–40 (5th Cir.1980) (Vance, J.) (assuming legitimacy of goal of preventing truancy, ordinance making it unlawful for coin-operated amusement centers to allow persons under the age of 17 to play or operate a coin-operated amusement machine violated equal protection because it singled out coin-operated amusement centers for its policy of preventing truancy), *rev'd in part on other grounds*, 455 U.S.

283, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982), *on remand*, 713 F.2d 137 (5th Cir.1983).[6]

For the foregoing reasons, I respectfully dissent.

---

**6.** Moreover, because § 34–9–285 apportions income benefits for employees whose preexisting condition is aggravated by an occupational disease, such handicapped persons (for lack of a better term) would probably be reluctant to work in industries where occupational diseases were prevalent. Handicapped persons might forego employment because of the knowledge that they would only be partially compensated if completely disabled by an occupational disease. Thus, the incentive to employers, if § 34–9–285 can be called that, would therefore not make a real difference in the hiring of handicapped persons.