Matter of Spence v New York State Dept. of Agric. & Mkts. (2018 NY Slip Op 06071)

Matter of Spence v New York State Dept. of Agric. & Mkts.

2018 NY Slip Op 06071 [32 NY3d 991]

September 18, 2018

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, November 28, 2018

[*1]

In the Matter of Wayne Spence, as President of the New York State Public Employees Federation, AFL-CIO, et al., Appellants,
v
New York State Department of Agriculture and Markets et al., Respondents.

Decided September 18, 2018

Matter of Spence v New York State Dept. of Agric. & Mkts., 154 AD3d 1234, affirmed.

APPEARANCES OF COUNSEL

Edward J. Aluck, New York State Public Employees Federation, AFL-CIO, Albany (Jessica C. Caggiano of counsel), for appellants.
Barbara D. Underwood, Attorney General, Albany (Jonathan D. Hitsous, Andrew D. Bing and Victor Paladino of counsel), for respondents.

{**32 NY3d at 992} OPINION OF THE COURT

On review of submissions pursuant to section 500.11 of the Rules of the Court of Appeals (22 NYCRR 500.11), order, insofar as appealed from, affirmed, without costs. The challenged policy has not been shown to be unconstitutional (see Civil Service Comm'n v Letter Carriers, 413 US 548, 564 [1973]; see also United States v Treasury Employees, 513 US 454, 467 [1995]).
Concur: Chief Judge DiFiore and Judges Stein, Fahey, Garcia and Feinman. Judge Rivera dissents in an opinion. Judge Wilson dissents in a separate dissenting opinion.

Rivera, J. (dissenting). I would reverse and remand to the Appellate Division for consideration of the claims raised herein as it appears its decision may be based on an erroneous legal standard. As discussed in Judge Wilson's thoughtful dissent, petitioners raise important questions of constitutional rights that should be fully considered by the Appellate Division in the first instance.
Respondents New York State Department of Agriculture and Markets and its Commissioner denied the requests to run for county legislator of two state dairy products specialists, petitioners Gregory Kulzer and Ronald Brown. Petitioners, along with their union, New York State Public Employees Federation (AFL-CIO), and its president, Wayne Spence, filed{**32 NY3d at 993} this hybrid declaratory judgment action/CPLR article 78 proceeding challenging the constitutionality of those individual determinations and the Department's revised policy prohibiting employees responsible for inspection of regulated entities—like Kulzer and Brown—from campaigning for or holding elected office. Supreme Court (61 Misc 3d 337 [Sup Ct, Albany County 2016]) and the Appellate Division (154 AD3d 1234 [3d Dept 2017]) both rejected petitioners' constitutional arguments.[FN*]
In United States v Treasury Employees (513 US 454, 466-468 and n 11 [1995]), the United States Supreme Court clarified that a heightened standard, one less deferential to government than the test established in Pickering v Board of Ed. of Township High School Dist. 205, Will Cty. (391 US 563 [1968]) [*2]applies to public employee First Amendment challenges involving a generally applicable law. In Janus v State, County, and Municipal Employees (585 US &mdash, 138 S Ct 2448 [2018]), the Court reaffirmed that across-the-board limitations on public employee speech are subject to considerably greater and critical examination. The Court explained:
"A speech-restrictive law with 'widespread impact,' we have said, 'gives rise to far more serious concerns than could any single supervisory decision.' Therefore, when such a law is at issue, the government must shoulder a correspondingly 'heav[ier]' burden, and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights. The end product of those adjustments is a test that more closely resembles exacting scrutiny than the traditional Pickering analysis." (585 US at &mdash, 138 S Ct at 2472 [citations omitted], quoting Treasury Employees, 513 US at 466, 468.)
The Appellate Division resolved petitioners' appeal before Janus was decided, and the opinion below relies expressly on{**32 NY3d at 994} Pickering for its conclusion that petitioners failed to establish the unconstitutionality of the Department's policy, without reference to the exacting scrutiny required by Treasury Employees. In fact, Treasury Employees is cited once without discussion or elaboration, as part of a "see generally" string citation at the end of the Court's analysis (Matter of Spence v New York State Dept. of Agric. & Mkts., 154 AD3d 1234, 1238 [3d Dept 2017]). It is therefore unclear whether the Appellate Division applied the proper standard to petitioners' claims. Accordingly, I would remand to the Appellate Division so that it may consider under the standard in Treasury Employees, and with the benefit of the Supreme Court's directive in Janus that courts apply "exacting scrutiny" to widespread legislative limits on public employee speech, whether the Department here sustained its heavy burden, and whether its policy is entitled to the less deferential standard afforded laws passed by the legislature.
For the reasons discussed above and in Judge Wilson's dissent, recent Supreme Court decisions are relevant to the analysis of petitioners' constitutional claims. I would remand for consideration of these decisions and therefore dissent.

Wilson, J. (dissenting). For the past 34 years, Gregory Kulzer has worked for the Department of Agriculture and Markets as a dairy products specialist, responsible for inspecting milk plants to ensure the quality and safety of milk, cheese, butter and yogurt we consume. In 2013, Mr. Kulzer decided he would like to serve as a local legislator in Lewis County. He submitted an [*3]outside activity request to the Department, which approved his request. Mr. Kulzer, a registered Republican, was elected to a two-year term later that year. When, as the Department annually required, Mr. Kulzer renewed his outside activity request in 2014, the Department denied it "based upon a conflict of interest and/or an appearance of a conflict of interest pursuant to . . . Public Officers Law § 74." On April 6, 2015, the Department revised its Employee Policies Handbook to include a revised "Political Activities" policy. As part of the policy, "[a]ny employee that holds a position that requires him or her to conduct inspections of regulated parties may not campaign for or hold elected office (e.g., County Legislator)."
The First Amendment protects campaigning for elected office (see Castine v Zurlo, 756 F3d 171, 176 [2d Cir 2014]). The United States Supreme Court has recognized the importance of the Constitution's protections for political participation (see{**32 NY3d at 995} Williams v Rhodes, 393 US 23, 32 [1968] ["Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms"]; Illinois Bd. of Elections v Socialist Workers Party, 440 US 173, 184 [1979] ["By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences. And for reasons too self-evident to warrant amplification here, we have often reiterated that voting is of the most fundamental significance under our constitutional structure"]). Government employees do not "relinquish[ ] the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest" upon entering public service (United States v Treasury Employees, 513 US 454, 465 [1995] [internal quotation marks omitted], quoting Pickering v Board of Ed. of Township High School Dist. 205, Will Cty., 391 US 563, 568 [1968]). I believe the majority fully agrees with the above.
Determining the validity of a restraint on speech by public employees requires a "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" (Pickering, 391 US at 568). Here, the Department's outside activities policy is categorical and prophylactic, not individual and post hoc; that is, the policy "chills potential speech before it happens" (Treasury Employees, 513 US at 468). As such,
"the Government's burden is greater with respect to this [type of] statutory restriction on expression than with respect to an isolated disciplinary action. The Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government" (id.).[FN1]{**32 NY3d at 996} 
The majority cites to Treasury Employees but fails to engage with its "heavy" burden at all (id. at 466).

To be sure, the United States Supreme Court has upheld similar restraints imposed by the Hatch Act (see Public Workers v Mitchell, 330 US 75 [1947]; Civil Service Comm'n v Letter Carriers, 413 US 548 [1973]). The majority appears to take the results from those cases as outcome-determinative here, but it is their analytical method—not their result—that pertains. The rule set out in those cases—as well as in long-standing Supreme Court doctrine concerning impingement of First Amendment rights[FN2] involves a balancing of the degree of impingement against the particular interest the government seeks to [*4]address through the restrictions. Congress' purposes underlying the Hatch Act are very different from those underlying the Department's policy here. The constitutionally required balance must be performed with the Department's purposes in mind, and the restrictions—though sufficiently narrowly tailored to address Congress' Hatch Act concerns—are not narrowly tailored as to the Department's.
Mitchell and Letter Carriers upheld restrictions contained in the Hatch Act.[FN3] The policy goals underlying the Hatch Act, as identified by the United States Supreme Court, were "an efficient government, faithful to the Congress rather than to party"; "avoiding the danger of a powerful political machine" because of "the large and growing federal bureaucracy and its partisan potential"; and "ensuring that employees achieve advancement on their merits and that they be free from both coercion and the prospect of favor from political activity" (see Magill v Lynch, 560 F2d 22, 27-28 [1st Cir 1977] [discussing Letter Carriers]). "[T]he Supreme Court stressed on almost every page of the Letter Carriers opinion that the central purpose of the Hatch Act was to prevent the corruption of federal employment by political party activity" (Blaylock v United States Merit Sys. Protection Bd., 851 F2d 1348, 1353 [11th Cir 1988]). The Supreme Court later distinguished the Hatch Act from other restrictions, noting that the Hatch Act "aimed to protect employees' rights, notably their right to free{**32 NY3d at 997} expression, rather than to restrict those rights" (Treasury Employees, 513 US at 471 [emphasis omitted]).
The Department's rule in this case is motivated by quite dissimilar concerns. The Department has consistently asserted that the justification for its outside activities policy is eliminating the risk of actual or apparent conflicts of interest. The Department has never suggested that elimination of partisan political influence or the fear of partisan takeover of the Department of Agriculture and Markets makes up any part of the Department's motivation for its policy, nor is there any support in the record for such a contention. Indeed, the Department has asserted that partisanship is irrelevant to the concerns motivating its restraints on speech, insisting that its "concern exists regardless of whether the employee is running for the county legislature, a school board, or any other publicly elected position." (Even if the Department were genuinely concerned about a partisan takeover of milk inspection, or New York agriculture more generally, its policy applies to partisan and nonpartisan elections alike, rendering it overbroad.)
Here, because of "the absence of substantial party involvement . . . the interests identified by the Letter Carriers Court lose much of their force" (Magill, 560 F2d at 29; see also Treasury Employees, 513 US at 471 ["Unlike partisan political activity, however, honoraria hardly appear to threaten employees' morale or liberty"]). Thus, the fact that Mr. Kulzer won a partisan election is of no moment. It is not the partisan/nonpartisan nature of the office sought that brings this case outside the realm of Letter Carriers and Mitchell. It is that the government's justification in those cases relied on partisanship, which concern is concededly absent here.
So long as the Department's rationale is not pretextual, we must consider the justification advanced by the Department at the time of the policy's enactment—not any different post hoc justification (though none is offered here) (see e.g. Wallace v Jaffree, 472 US 38, 57 [1985] [rejecting post hoc secular justifications for an Alabama statute authorizing moments of silence in schools, where the legislative history clearly indicated that the goal was non-secular—a "return (to) voluntary prayer"]). Merely because Congress had a sufficient legislative purpose in 1939 to justify the Hatch Act's restrictions does not mean that any other governmental entity can lawfully impose identical restrictions on speech, irrespective of whether that governmental entity has a completely different purpose, no purpose, or an invidious purpose.{**32 NY3d at 998}
As the Court recognized in Treasury Employees, avoiding the appearance of impropriety can be a legitimate government interest. However, legitimate interests alone do not make a rule constitutional: "Our cases do not support the notion that the bare assertion of a laudable purpose justifies wide-ranging intrusions on First Amendment [*5]liberties" (Treasury Employees at 483 [O'Connor, J., concurring in part, dissenting in part]).
"[W]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.' . . . It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." (Id. at 475 [emphasis added], quoting Turner Broadcasting System, Inc. v FCC, 512 US 622, 664 [1994]).
In Treasury Employees, the Court struck down the ban on executive branch employees receiving honoraria for speeches.[FN4] In addressing the weight to give the government's interest, the Court noted that the government relied "on limited evidence of actual or apparent impropriety by legislators and high-level executives" (id. at 472). In contrast, the Court upheld the provisions of the Hatch Act in Letter Carriers because Congress enacted them "only after canvassing nearly a century of concrete experience with the evils of the political spoils system" (id. at 483-484 [O'Connor, J., concurring in part, dissenting in part], citing FCC v League of Women Voters of Cal., 468 US 364, 401 n 27 [1984] [the Hatch Act "evolved over a century of governmental experience with less restrictive alternatives that proved to be inadequate to maintain the effective operation of government"]).
{**32 NY3d at 999}Here, the Department's posited justification was based on one incident—the circumstances of which are disputed—and has since resulted in a rule that restricts inspectors from campaigning for and holding a range of elected offices. The Department does not offer any additional evidence. In fact, in its Appellate Division briefing, the Department claimed that it "grounded its actions in the appearance of conflict," and as such, "the Department did not need to identify a 'real' conflict with particularity." To the contrary, "a 'reasonable' burden on expression requires a justification far stronger than mere speculation about serious harms" (Treasury Employees, 513 US at 475).
Additionally, it is important to note that the outside activities policy was created by the New York State Department of Agriculture and Markets; not Congress, not the New York State Legislature, not any legislative body. In Treasury Employees, the Court recognized: "We normally accord a stronger presumption of validity to a congressional judgment than to an individual executive's disciplinary action" (513 US at 468; see also Harman v City of New York, 140 F3d 111, 122 n 5 [2d Cir 1998] ["executive orders such as those at issue here are entitled to less deference than legislative determinations such as the Hatch Act"]). Mitchell and Letter Carriers both emphasized the importance of Congress' role in considering the public policies behind the Hatch Act (see Mitchell, 330 US at 99-100; Letter Carriers, 413 US at 556, 561-563). Here, a non-legislative body has adopted a broad speech restraint, concededly based on a single experience, amounting to a "bare assertion of a laudable purpose."
[*6]
But let us assume that the need to avoid conflicts and the appearance of conflicts is as great for milk inspectors or Lewis County legislators as it is for judges or state legislators. Even so, the Department's restrictions are not narrowly tailored to serve that end; numerous less-restrictive alternatives are available. The narrow-tailoring analysis must be different for conflict-of-interest concerns than for the partisan takeover concerns, because a restriction's breadth must depend on the harm to be avoided (see Treasury Employees, 513 US at 472 ["Instead of a concern about the 'cumulative effect' of a widespread practice that Congress deemed to 'menace the integrity and the competency of the service,' Mitchell, 330 U.S., at 103, the Government relies here on limited evidence of actual or apparent impropriety by legislators and high-level executives,{**32 NY3d at 1000} together with the purported administrative costs of avoiding or detecting lower level employees' violations of established policies"]).
Thus, because the Department's stated justification here is based on potential conflicts of interest, such conflicts could be—and routinely are—dealt with by recusal rules, such as those that apply to judges (see e.g. Judiciary Law §§ 14 [disqualification/recusal], 16-17 [part-time judges], 471 [judicial clerks]), or state legislators (see e.g. Rules of Senate of St of NY 2017-2018 rule X, § 1; Public Officers Law § 74). Persons violating those types of rules face disciplinary proceedings and criminal prosecution (for example, Sheldon Silver, the former Speaker of the State Assembly, and Dean Skelos, the former State Senate majority leader, were charged with corruption for engaging in bribery and conflicted transactions[FN5] . The partisan takeover concerns Congress addressed through the Hatch Act could not have been addressed by recusal rules, and perhaps not even by the threat of criminal prosecution, where the fear was control of the entire government by a single ruling party. Likewise, where avoidance of partisan takeover might justify a ban on campaigning for office, prohibiting a public employee from running for elective office, contingent upon resigning if elected, serves no purpose articulated by the Department.
The Department's policy is not a "reasonable response to the posited harms" (Treasury Employees, 513 US at 476). The policy does not provide a definition of elected office that would restrict the policy's scope, nor does it set out any exceptions or procedures for recusal. Instead, the Department nakedly asserts it could not tailor the rule more narrowly: "the Department reasonably determined that there was no way to remove the taint of dual office-holding" as "[a]ny inspectors who campaigned for elected office would be susceptible to claims that they were soliciting special favors from supporters." (Of course, the same would be true for judges or legislators.) The fact that the policy is limited to inspectors does not make the policy sufficiently tailored. The policy must be a reasonable response to the legitimate government interest at stake. In the context of the Hatch Act, the Supreme Court held that the law{**32 NY3d at 1001} was constitutional even when applied to a large number of federal employees, because it was based on the "conviction that the rapidly expanding Government work force should not be employed to build a powerful, invincible, and perhaps corrupt political machine" (Letter Carriers, 413 US at 565). Here, however, the Department's posited interest is the potential for conflicts of interest, yet the restriction would prevent Mr. Kulzer from running for school board, water commissioner or dog catcher.
The "speculative benefits" of the Department's outside activities policy "are not sufficient to justify this crudely crafted burden on [employees'] freedom to engage in expressive activities" (see Treasury Employees, 513 US at 477). The Department has, without the benefits of the legislative process, created a broad rule that impermissibly curtails First Amendment rights. Without analysis, the majority affirms simply because the Hatch Act is constitutional. Following the holding instead of the outcome of United States Supreme Court precedent requires us to determine that the Department's rule is unconstitutional. Accordingly, I dissent.[*7]

Footnotes

Footnote *:The Appellate Division treated as abandoned petitioners' state constitutional claims and limited its decision to the First Amendment challenge. On appeal to this Court, petitioners assert both federal and state constitutional claims (letter brief for petitioners-appellants, dated Apr. 11, 2018 at 4-5), but note that "most courts simply conduct the First Amendment analysis and dispense with all free speech claims accordingly" (id. at 6 n 3). Since I conclude that the matter should be remanded for further consideration, I do not address whether, assuming the Department's policy survives scrutiny under the proper federal legal standard, our State Constitution's more expansive free speech protections would result in a different outcome.

Footnote 1:The Department claims that Mr. Kulzer, though citing Pickering, did not cite Treasury Employees, and therefore did not preserve any argument that Treasury Employees imposes a heightened level of scrutiny for restrictions on speech of government employees that have a potential to chill expression. We must follow binding precedent even if the parties do not mention it; indeed, "we [cannot] ignore binding Supreme Court precedent simply because the parties purportedly 'agree' that we should—even if applying the wrong law would somehow produce the right result." (Paramount Pictures Corp. v Allianz Risk Transfer AG, 31 NY3d 64, 69 n 3 [2018].)

Footnote 2:See Thornhill v Alabama, 310 US 88, 96 (1940); NAACP v Button, 371 US 415, 438 (1963); Broadrick v Oklahoma, 413 US 601, 611 (1973); Pickering, 391 US at 568.

Footnote 3:I assume the continuing validity of the Hatch Act cases as controlling federal constitutional law. No challenge under New York's Constitution is made here.

Footnote 4:The plaintiffs in Treasury Employees (unions representing a class of executive branch employees below grade GS-16) challenged the broad application of the honoraria ban. The Court addressed the relief sought, and agreed with the government that the remedy should be limited to the class of employees before the Court, but disagreed that the Court should sever the legislation and hold it constitutional where a "nexus" exists between the speech and the speaker's official duties, i.e., where it might be constitutional (see Treasury Employees at 478-479). The Court rejected the narrower application because of an "obligation to avoid judicial legislation"; instead, the Court agreed that the lower court "properly left to Congress the task of drafting a narrower statute" (id. at 479). Justice O'Connor, however, would have tailored the relief to "invalidation of the statute insofar as it applies to honoraria [received] for speech without nexus to Government employment" (id. at 485).

Footnote 5:See Vivian Wang, Guilty, Again: Dean Skelos, Former Senate Leader, Is Convicted of Corruption in Retrial, NY Times, July 17, 2018, available at https://www.nytimes.com/2018/07/17/nyregion/dean-skelos-corruption-son-senate-ny.html; Benjamin Weiser, Sheldon Silver Is Convicted in 2nd Corruption Trial, NY Times, May 11, 2018, available at https://www.nytimes.com/2018/05/11/nyregion/sheldon-silver-retrial-guilty.html.