***992 On review of submissions pursuant to section 500.11 of the Rules of the Court of Appeals ( 22 NYCRR 500.11 ), order, insofar as appealed from, affirmed, without costs. The challenged policy has not been shown to be unconstitutional (see United States Civ. Serv. Commn. v. National Assn. of Letter Carriers , 413 U.S. 548, 564, 93 S.Ct. 2880, 37 L.Ed.2d 796 [1973] ; see also United States v. National Treasury Employees Union , 513 U.S. 454, 467, 115 S.Ct. 1003, 130 L.Ed.2d 964 [1995] ).
Chief Judge DiFiore and Judges Stein, Fahey, Garcia and Feinman concur. Judge Rivera dissents in an opinion. Judge Wilson dissents in a separate dissenting opinion.
I would reverse and remand to the Appellate Division for consideration of the claims raised herein as it appears its decision may be based on an erroneous legal standard. As discussed in Judge Wilson's thoughtful dissent, petitioners raise important questions of constitutional rights that should be fully considered by the Appellate Division in the first instance.
Respondents New York State Department of Agriculture and Markets and its Commissioner denied the requests to run for county legislator of two state dairy products specialists, petitioners Gregory Kulzer and Ronald Brown. Petitioners, along with their union, New York State Public Employees Federation (AFL-CIO) and its president, Wayne Spence, filed ***993 this hybrid declaratory judgment/CPLR article 78 proceeding challenging the constitutionality of those individual determinations and the Department's revised policy prohibiting employees responsible for inspection of regulated entities-like Kulzer and Brown-from campaigning for or holding elected office. Supreme Court and the Appellate Division both rejected petitioners' constitutional arguments.*
In United States v. National Treasury Employees Union. 513 U.S. 454, 466-468 and n. 11, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), the United States Supreme Court clarified that a heightened standard, one less deferential to government than the **414 *308 test established in Pickering v. Board of Education of Township High School District 205, Will County, Ill., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) applies to public employee First Amendment challenges involving a generally applicable law. In Janus v. State, County and Municipal Employees, --- U.S. ----, 138 S.Ct. 2448, 201 L.Ed.2d 924 (2018), the Court reaffirmed that across-the-board limitations on public employee speech are subject to considerably greater and critical examination. The Court explained:
"A speech-restrictive law with 'widespread impact,' we have said, 'gives rise to far more serious concerns than could any single supervisory decision. Therefore, when such a law is at issue, the government must shoulder a correspondingly 'heav[ier]' burden, and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights. The end product of those adjustments is a test that more closely resembles exacting scrutiny than the traditional Pickering analysis." ( 585 U.S. at ----, 138 S.Ct. at 2472 [citations omitted], quoting Treasury Employees , 513 U.S. at 466, 468 [115 S.Ct. 1003 ).
The Appellate Division resolved petitioners' appeal before Janus was decided, and the opinion below relies expressly on ***994 Pickering for its conclusion that petitioners failed to establish the unconstitutionality of the Department's policy, without reference to the exacting scrutiny required by National Treasury . In fact, National Treasury is cited once without discussion or elaboration, as part of a "see generally" string citation at the end of the court's analysis ( Spence v. New York State Dept of Agriculture and Mkts. , 154 A.D.3d 1234, 1238, 64 N.Y.S.3d 328 [3d Dept. 2017] ). It is therefore unclear whether the Appellate Division applied the proper standard to petitioners' claims. Accordingly, I would remand to the Appellate Division so that it may consider under the standard in National Treasury , and with the benefit of the Supreme Court's directive in Janus that courts apply "exacting scrutiny" to widespread legislative limits on public employee speech, whether the Department here sustained its heavy burden, and whether its policy is entitled to the less deferential standard afforded laws passed by the legislature.
For the reasons discussed above and in Judge Wilson's dissent, recent Supreme Court decisions are relevant to the analysis of petitioners' constitutional claims. I would remand for consideration of these decisions and therefore dissent.
For the past 34 years, Gregory Kulzer has worked for the Department of Agriculture as a dairy products specialist, responsible for inspecting milk plants to ensure the quality and safety of milk, cheese, butter and yogurt we consume. In 2013, Mr. Kulzer decided he would like to serve as a local legislator in Lewis County. He submitted an outside activity request to the Department, which approved his request. Mr. Kulzer ran as a Republican, and the voters elected him to a two-year term later that year. When, as the Department annually required, Mr. Kulzer renewed his outside activity request in 2014, the Department denied it "based upon a conflict of interest and/or an appearance of a conflict of interest pursuant to ... Public Officers Law § 74." On April 6, 2015, the Department revised its Employee Policies Handbook to include a revised "Political Activities" policy. As part of the policy, "[a]ny employee that holds a position that requires him or her to conduct inspections of regulated parties may not campaign for **415 *309 or hold elected office (e.g., County Legislator)."
The First Amendment protects campaigning for elected office (see Castine v. Zurlo , 756 F.3d 171, 176 [2d Cir. 2014] ). The United States Supreme Court has recognized the importance of the Constitution's protections for political participation (see ***995 Williams v. Rhodes , 393 U.S. 23, 32, 89 S.Ct. 5, 21 L.Ed.2d 24 [1968] ["Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms"]; Illinois State Bd. of Elections v. Socialist Workers Party , 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 [1979] ["By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences. And for reasons too self-evident to warrant amplification here, we have often reiterated that voting is of the most fundamental significance under our constitutional structure"] ). Government employees do not "relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest" upon entering public service ( United States v. National Treasury Employees Union , 513 U.S. 454, 465, 115 S.Ct. 1003, 130 L.Ed.2d 964 [1995], quoting Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty. , 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 [1968] ). I believe the majority fully agrees with the above.
Determining the validity of a restraint on speech by public employees requires a "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" ( Pickering , 391 U.S. at 568, 88 S.Ct. 1731 ). Here, the Department's outside activities policy is categorical and prophylactic, not individual and post hoc ; that is, the policy "chills potential speech before it happens" ( National Treasury , 513 U.S. at 468, 115 S.Ct. 1003 ). As such,
"the Government's burden is greater with respect to this [type of] statutory restriction on expression than with respect to an isolated disciplinary action. The government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the government" ( id. ).[1]
***996 The majority cites to National Treasury but fails to engage with its "heavy" burden at all ( id. at 466, 115 S.Ct. 1003 ).
To be sure, the United States Supreme Court has upheld similar restraints imposed by the Hatch Act (see United Public Workers of America v. Mitchell , 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 [1947] ; US Civil Service Commission v. National Association of Letter Carriers, AFL-CIO , 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 [1973] ). The majority appears to take the results from those cases as outcome-determinative here, but it is their analytical method - not their result - that pertains. The rule set out in those cases - **416 *310 as well as in longstanding Supreme Court doctrine concerning impingement of First Amendment rights[2] involves a balancing of the degree of impingement against the particular interest the government seeks to address through the restrictions. Congress' purposes underlying the Hatch Act are very different from those underlying the Department's policy here. The constitutionally required balance must be performed with the Department's purposes in mind, and the restrictions - though sufficiently narrowly tailored to address Congress' Hatch-Act concerns - are not narrowly tailored as to the Department's.
Mitchell and Letter Carriers upheld restrictions contained in the Hatch Act.[3] The policy goals underlying the Hatch Act, as identified by the United States Supreme Court, were "an efficient government, faithful to the Congress rather than to party"; "avoiding the danger of a powerful political machine" because of "the large and growing federal bureaucracy and its partisan potential"; and "ensuring that employees achieve advancement on their merits and that they be free from both coercion and the prospect of favor from political activity" (see Magill v. Lynch , 560 F.2d 22, 27-28 [1st Cir. 1977] [discussing Letter Carriers ] ). "[T]he Supreme Court stressed on almost every page of the Letter Carriers opinion that the central purpose of the Hatch Act was to prevent the corruption of federal employment by political party activity" ( Blaylock v. U.S. Merit Sys. Prot. Bd. , 851 F.2d 1348, 1353 [11th Cir. 1988] ). The Supreme Court later distinguished the Hatch Act from other restrictions, noting that the Hatch Act "aimed to protect employees' rights, notably their right to free ***997 expression, rather than to restrict those rights" ( National Treasury , 513 U.S. at 471, 115 S.Ct. 1003 ).
The Department's rule in this case is motivated by quite dissimilar concerns. The Department has consistently asserted that the justification for its outside activities policy is eliminating the risk of actual or apparent conflicts of interest. The Department has never suggested that elimination of partisan political influence or the fear of partisan takeover of the Department of Agriculture makes up any part of the Department's motivation for its policy, nor is there any support in the record for such a contention. Indeed, the Department has asserted that partisanship is irrelevant to the concerns motivating its restraints on speech, insisting that its "concern exists regardless of whether the employee is running for the county legislature, a school board, or any other publicly elected position." (Even if the Department were genuinely concerned about a partisan takeover of milk inspection, or New York agriculture more generally, its policy applies to partisan and nonpartisan elections alike, rendering it overbroad.)
Here, because of "the absence of substantial party involvement ... the interests identified by the Letter Carriers Court lose much of their force" ( Magill , 560 F.2d 22 at 29 ; see also National Treasury , 513 U.S. at 471, 115 S.Ct. 1003 ["Unlike partisan political activity, however, honoraria hardly appear to threaten employees' morale or liberty"] ). Thus, **417 *311 the fact that Mr. Kulzer won a partisan election is of no moment. It is not the partisan/nonpartisan nature of the office sought that brings this case outside the realm of Letter Carriers and Mitchell . It is that the government's justification in those cases relied on partisanship, which concern is concededly absent here.
So long as the Department's rationale is not pretextual, we must consider the justification advanced by the Department at the time of the policy's enactment - not any different post hoc justification (though none is offered here) (see e.g. , Wallace v. Jaffree , 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 [1985] [rejecting post hoc secular justifications for an Alabama statute authorizing moments of silence in schools, where the legislative history clearly indicated that the goal was non-secular - a "return to voluntary prayer"] ). Merely because Congress had a sufficient legislative purpose in 1939 to justify the Hatch Act's restrictions does not mean that any other governmental entity can lawfully impose identical restrictions on speech, irrespective of whether that governmental entity has a completely different purpose, no purpose, or an invidious purpose.
***998 As the Court recognized in National Treasury , avoiding the appearance of impropriety can be a legitimate government interest. However, legitimate interests alone do not make a rule constitutional: "Our cases do not support the notion that the bare assertion of a laudable purpose justifies wide-ranging intrusions on First Amendment liberties" ( National Treasury at 483, 115 S.Ct. 1003 [O'Connor, J., concurring in part, dissenting in part] ).
"When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.' It must demonstrate that the recited harms are real, not merely conjectural , and that the regulation will in fact alleviate these harms in a direct and material way ." ( Id. at 475, 115 S.Ct. 1003 [emphasis added], quoting Turner Broad. Sys., Inc. v. Federal Commc'ns Comm'n , 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 [1994] ).
In National Treasury , the Court struck down the ban on executive employees receiving honoraria for speeches.[4] In addressing the weight to give the government's interest, the Court noted that the government relied "on limited evidence of actual or apparent impropriety by legislators and high-level executives" ( id. at 472, 115 S.Ct. 1003 ). In contrast, the Court upheld the provisions of the Hatch Act in Mitchell because Congress enacted them "only after canvassing nearly a century of concrete experience with the evils of the political spoils system" ( id. at 483-484, 115 S.Ct. 1003 [O'Connor, J., concurring in part, dissenting in part, citing *312 **418 FCC v. League of Women Voters of Cal. , 468 U.S. 364, 401, 104 S.Ct. 3106, 82 L.Ed.2d 278 [1984] [the Hatch Act "evolved over a century of governmental experience with less restrictive alternatives that proved to be inadequate to maintain the effective operation of government"] ). ***999 Here, the Department's posited justification was based on one incident - the circumstances of which are disputed - and has since resulted in a rule that restricts inspectors from campaigning for and holding a range of elected offices. The Department does not offer any additional evidence. In fact, in its Appellate Division briefing, the Department claimed that it "grounded its actions in the appearance of conflict," and as such, "the Department did not need to identify a 'real' conflict with particularity." To the contrary, "a 'reasonable' burden on expression requires a justification far stronger than mere speculation about serious harms" ( National Treasury , 513 U.S. at 475, 115 S.Ct. 1003 ).
Additionally, it is important to note that the outside activities policy was created by the New York State Department of Agriculture; not Congress, not the New York State Legislature, not any legislative body. In National Treasury , the Court recognized: "We normally accord a stronger presumption of validity to a congressional judgment than to an individual executive's disciplinary action" ( 513 U.S. at 468, 115 S.Ct. 1003 ; see also Harman v. City of New York , 140 F.3d 111, 122 n. 5 [2d Cir. 1998] ["executive orders such as those at issue here are entitled to less deference than legislative determinations such as the Hatch Act"] ). Mitchell and Letter Carriers both emphasized the importance of Congress' role in considering the public policies behind the Hatch Act (see Mitchell , 330 U.S. at 99-100, 67 S.Ct. 556 ; Letter Carriers , 413 U.S. at 556, 561-63, 93 S.Ct. 2880 ). Here, a non-legislative body has adopted a broad speech restraint, concededly based on a single experience, amounting to a "bare assertion of a laudable purpose."
But let us assume that the need to avoid conflicts and the appearance of conflicts is as great for milk inspectors or Lewis County legislators as it is for judges or state legislators. Even so, the Department's restrictions are not narrowly tailored to serve that end; numerous less-restrictive alternatives are available. The narrow-tailoring analysis must be different for conflict-of-interest concerns than for the partisan takeover concerns, because a restriction's breadth must depend on the harm to be avoided (see National Treasury , 513 U.S. at 472, 115 S.Ct. 1003 ["Instead of a concern about the 'cumulative effect' of a widespread practice that Congress deemed to 'menace the integrity and the competency of the service,' Mitchell , 330 U.S. at 103, 67 S.Ct. 556, the Government relies here on limited evidence of actual or apparent impropriety by legislators and high-level executives, ***1000 together with the purported administrative costs of avoiding or detecting lower level employees' violations of established policies"] ).
Thus, because the Department's stated justification here is based on potential conflicts of interest, such conflicts could be - and routinely are - dealt with by recusal rules, such as those that apply to judges (see e.g. , N.Y. Judiciary Law § 14 [disqualification/recusal], 16-17 [part-time judges], 471 [judicial clerks] ), or state legislators (see e.g. , N.Y. Senate Rule § 10.1; NY Public Officer Law § 74 ). Persons violating those types of rules face disciplinary proceedings and criminal prosecution (for example, Sheldon Silver, the former Speaker of the State Assembly, and Dean Skelos, the former State Senate majority leader, were charged with corruption for engaging in bribery and conflicted transactions **419 [5] ). *313 The partisan takeover concerns Congress addressed through the Hatch Act could not have been addressed by recusal rules, and perhaps not even by the threat of criminal prosecution, where the fear was control of the entire government by a single ruling party. Likewise, where avoidance of partisan takeover might justify a ban on campaigning for office, prohibiting a public employee from running for elective office, contingent upon resigning if elected, serves no purpose articulated by the Department.
The Department's policy is not a "reasonable response to the posited harms" ( National Treasury , 513 U.S. at 476, 115 S.Ct. 1003 ). The policy does not provide a definition of elected office that would restrict the policy's scope, nor does it set out any exceptions or procedures for recusal. Instead, the Department nakedly asserts it could not tailor the rule more narrowly: "the Department reasonably determined that there was no way to remove the taint of dual office-holding" as "[a]ny inspectors who campaigned for elected office would be susceptible to claims that they were soliciting special favors from supporters." (Of course, the same would be true for judges or legislators.) The fact that the policy is limited to inspectors does not make the policy sufficiently tailored. The policy must be a reasonable response to the legitimate government interest at stake . In the context of the Hatch Act, the Supreme Court held that the law ***1001 was constitutional even when applied to a large number of federal employees, because it was based on the "conviction that the rapidly expanding Government work force should not be employed to build a powerful, invincible, and perhaps corrupt political machine" ( Letter Carriers , 413 U.S. at 565, 93 S.Ct. 2880 ). Here, however, the Department's posited interest is the potential for conflicts of interest, yet the restriction would prevent Mr. Kulzer from running for school board, water commissioner or dog catcher.
The "speculative benefits" of the Department's outside activities policy "are not sufficient to justify this crudely crafted burden on respondents' freedom to engage in expressive activities" (see National Treasury , 513 U.S. at 477, 115 S.Ct. 1003 ). The Department has, without the benefits of the legislative process, created a broad rule that impermissibly curtails First Amendment rights. Without analysis, the majority affirms simply because the Hatch Act is constitutional. Following the holding instead of the outcome of United States Supreme Court precedent requires us to determine that the Department's rule is unconstitutional. Accordingly, I dissent.

The Appellate Division treated as abandoned petitioners' state constitutional claims and limited its decision to the First Amendment challenge. On appeal to this Court, petitioners assert both federal and state constitutional claims (Pets' SSM Ltr, at 4-5), but note that "most courts simply conduct the First Amendment analysis and dispense with all free speech claims accordingly" (id. at 6 n. 3). Since I conclude that the matter should be remanded for further consideration, I do not address whether, assuming the Department's policy survives scrutiny under the proper federal legal standard, our state constitution's more expansive free speech protections would result in a different outcome.

The Department claims that Mr. Kulzer, though citing Pickering , did not cite National Treasury , and therefore did not preserve any argument that National Treasury imposes a heightened level of scrutiny for restrictions on speech of government employees that have a potential to chill expression. We must follow binding precedent even if the parties do not mention it; indeed, "we [cannot] ignore binding Supreme Court precedent simply because the parties purportedly 'agree' that we should-even if applying the wrong law would somehow produce the right result." (Paramount Pictures Corp. v. Allianz Risk Transfer AG , 31 N.Y.3d 64, 70 n. 3, 73 N.Y.S.3d 472, 96 N.E.3d 737 [2018].)

See Thornhill v. State of Alabama , 310 U.S. 88, 96, 60 S.Ct. 736, 84 L.Ed. 1093 [1940] ; National Association for Advancement of Colored People v. Button , 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 [1963] ; Broadrick v. Oklahoma , 413 U.S. 601, 611, 93 S.Ct. 2908, 37 L.Ed.2d 830 [1973] ; Pickering , 391 U.S. at 568, 88 S.Ct. 1731.

I assume the continuing validity of the Hatch Act cases as controlling federal constitutional law. No challenge under New York's Constitution is made here.

The plaintiffs in National Treasury (unions representing a class of Executive branch employees below grade GS-16) challenged the broad application of the honoraria ban. The Court addressed the relief sought, and agreed with the Government that the remedy should be limited to the class of employees before the Court, but disagreed that the Court should sever the legislation and hold it constitutional where a "nexus" exists between the speech and the speaker's official duties, i.e., where it might be constitutional (see National Treasury at 478-479, 115 S.Ct. 1003 ). The Court rejected the narrower application because of an "obligation to avoid judicial legislation"; instead, the Court agreed that the lower court "properly left to Congress the task of drawing a narrower statute." (id. at 479, 115 S.Ct. 1003 ). Justice O'Connor, however, would have tailored the relief to "invalidation of the statute insofar as it applies to honoraria [received] for speech without nexus to Government employment" (id. at 485, 115 S.Ct. 1003 ).

See Vivian Wang, Guilty, Again: Dean Skelos, Former Senate Leader, Is Convicted of Corruption in Retrial , N.Y. Times, July 17, 2018, available at https://www.nytimes.com/2018/07/17/nyregion/dean-skelos-corruption-son-senate-ny.html; Benjamin Weiser, Sheldon Silver Is Convicted in 2nd Corruption Trial , N.Y. Times, May 11, 2018, available at https://www.nytimes.com/2018/05/11/nyregion/sheldon-silver-retrial-guilty.html